**UNITED STATES FIDELITY & GUARANTY COMPANY**

v.

**The KORMAN CORPORATION, National Union Fire Insurance Company, Cigna Property and Casualty Insurance Company, David J. Smalls and Virginia L. Smalls, et al.**

Civ. A. No. 87–1070.

United States District Court,
E.D. Pennsylvania.

June 14, 1988.

---

Albert J. Schell, Jr., Allan C. Molotsky, Post & Schell, P.C., Philadelphia, Pa., for U.S. Fidelity & Guar. Co.

Ronald A. Krauss, Barry M. Klayman, Mark L. Alderman, Wolf, Block, Schorr, Solis–Cohen, Philadelphia, Pa., for Korman Corp.

Richard M. Shusterman, Guy A. Cellucci, Regina B. Mapes, White & Williams, Phila-

delphia, Pa., for Cigna Property and Cas. Ins. Co.

Perry S. Bechtle, K. Charles Gudenas, Leslie M. Cyr, LaBrum and Doak, Philadelphia, Pa., for Nat. Union Fire Ins. Co.

Mark R. Cuker, Philadelphia, Pa., for David J. Smalls et al.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, Senior District Judge.

United States Fidelity & Guaranty Company (USF & G) brought this declaratory judgment action to obtain a ruling whether it and two other insurance companies, CIGNA Property and Casualty Insurance Company (Cigna)[1] and National Union Fire Insurance Company (National Union), must provide The Korman Corporation (Korman) with coverage for claims against Korman in two underlying lawsuits currently pending in the Philadelphia Court of Common Pleas. The two underlying lawsuits are captioned *Smalls, et al. v. The Korman Corporation, et al.*, April Term, 1985, No. 633 (*Smalls I*), and *Smalls, et al. v. The Korman Corporation, et al.*, January Term, 1986, No. 781 (*Smalls II*).[2] Cigna, National Union, and Korman all asserted counterclaims against USF & G and crossclaims against each other seeking a declaration of their respective rights and obligations under the relevant policies. USF & G, Cigna, National Union, and Korman have all moved for judgment on the pleadings.

The plaintiffs in *Smalls I* and *Smalls II* are residents of a tract of land situated adjacent to the Clearview Landfill in Philadelphia, Pennsylvania (the landfill). The landfill allegedly accepted hazardous waste from 1956 through 1984. The *Smalls* plaintiffs allege that hazardous waste has

been released into the soil, surface waters, and ground waters in the landfill's vicinity and that smoke, noxious odors, and gases have been released into the atmosphere. The *Smalls* plaintiffs allege that, as a result, among other things, their homes have a reduced economic value.

All but one of the *Smalls* plaintiffs (Gene Kahaulelio, identified in the complaint as a "Class IV plaintiff") have claims against Korman. From 1973 through 1977, Korman and its joint venturers (the Korman group) bought tracts of land adjacent to the landfill, subdivided these tracts, and developed them for the construction and sale of residential properties. The Korman group named the development, which included over 200 new homes, "New Philadelphia." Those plaintiffs with claims against Korman either bought their homes during 1974 through 1984 directly from Korman (Class I) or bought their homes during 1977 through 1984 from a private seller who bought from Korman (Class II) or leased their homes beginning in 1981 or 1984 from Korman (Class III). Classes I, II, and III have claims against Korman for fraud (Count Seven). Classes I and III have claims against Korman for breach of contract (Count Nine) in addition to the fraud claims.

The fraud claims against Korman are set out in Count Seven of both of the *Smalls* complaints. The *Smalls* plaintiffs allege that the Korman group knew, yet failed to disclose to the plaintiffs, that the "New Philadelphia" homes were constructed on or adjacent to a landfill that had illegally served as a site for the disposal of hazardous and toxic wastes that were or could be leaching from the landfill into ground and surface waters on or adjacent to the development. Also, according to the *Smalls* plaintiffs, the Korman group knew and failed to disclose that the actual market values of the homes were significantly less

**1.** Cigna was sued under its former corporate name, Aetna Insurance Company. On May 26, 1988, this court approved Cigna's Suggestion of Name Change.

**2.** The named defendants in the two lawsuits are: The Korman Corporation, Redevelopment Authority of the City of Philadelphia, Clearview

Land Development Corp., City of Philadelphia, Citywide Services, Inc., Roma Associates, Inc., Graves Resource Management, Delaware County, New Eastwick Corporation, Reynolds Metal Co., Richard Heller, Edward Heller, Pasquale Delorenzo, and various "John Doe" corporations.

than the sales prices offered by the Korman group because of the development's location adjacent to the landfill and that the landfill posed a substantial health and safety danger to the occupants of the homes. Further, the *Smalls* plaintiffs allege that the Korman group intentionally or in a reckless disregard for the truth misrepresented that the plaintiffs could rely on the sound reputation of Korman and that the homes were in a safe and desirable area, were well-suited for raising young children, would appreciate in value faster than typical homes, were a wise investment, were offered at a fair price, and represented a good, honest value.

The Class I and III plaintiffs allege that, in completing their transactions with the Korman group, they relied on the Korman group and that the Korman group either failed to disclose or misrepresented facts that were basic to the transactions. Accordingly, the Class I plaintiffs seek damages for the difference between the actual fair market value of their homes and the value the homes would have had absent the problems caused by the landfill. The Class III plaintiffs seek damages for the difference between the rents they paid and the fair rental value of their homes and for reimbursement of their deposits. Also, the Class I and III plaintiffs seek damages for the costs of medical monitoring and for their emotional distress, inconvenience, and inability to enjoy the use of their land.

The Class II plaintiffs allege that the Korman group was aware that the New Philadelphia homes that it sold would inevitably be resold to persons of the Class II category and that the Korman group was under a public duty to disclose the facts concerning the landfill. The Class II plaintiffs further allege that it was foreseeable that persons such as the Class II plaintiffs would rely on the Korman group's misrepresentations and nondisclosures to the original purchasers and that, in fact, the Class II plaintiffs did so rely. Also, the Korman group allegedly made false representations directly to Class II plaintiffs. Accordingly, the Class II plaintiffs seek the same damages sought by the Class I plaintiffs plus punitive damages.

The breach of contract claims against Korman are set out in Count Nine of both of the *Smalls* complaints. The Class I and III plaintiffs allege that, pursuant to their contracts with the Korman group, the Korman group impliedly warranted that the New Philadelphia homes were habitable, fit, and desirable for residential use. Utilizing the same language as that contained in the fraud claims, the Class I and III plaintiffs allege breach of express and implied warranties as to safety, suitability and value.

The Korman group allegedly breached these implied and express warranties in that the homes were built on an illegal landfill which

(i) gave off noxious odors, gases, and fumes; (ii) were infested with rodents and other pests; (iii) contained residue of solid and hazardous waste which were leaching into ground and surface waters adjacent to the landfill; [and] (iv) posed a danger to the health and safety of the occupants of these homes ... [and in that the homes] (i) were not in a safe or desirable area; (ii) were not good family dwellings well suited for raising young children; (iii) did not appreciate in value at all, but rather depreciated in value relative to other homes; (iv) did not represent a wise investment; (v) were not offered at a fair price; (vi) did not represent a good, honest value; (vii) did not indicate that the Class I and Class III plaintiffs were wise to rely on the sound reputation of Korman Corporation.

Accordingly, under their breach of contract theory, the Class I plaintiffs seek damages for the difference between the current fair market value and the value the homes would have had absent the problems caused by the landfill. The Class III plaintiffs seek damages for the difference between the rental prices they paid and the fair rental values and for reimbursement of their deposits. Also, the Class I and III plaintiffs seek damages for their medical monitoring and their inconvenience and inability to enjoy the use of their land.

USF & G, National Union, and Cigna all provided Korman with comprehensive general liability insurance. Cigna covered Korman under eight consecutive year-long policies beginning March 1, 1970 and ending March 1, 1978. National Union covered Korman from May 1, 1978 to June 1, 1978. USF & G covered Korman under a policy originally issued on June 1, 1978, which was renewed several times through June 1, 1986.

At the outset, this court's subject matter jurisdiction over this action must be addressed. In its amended complaint, USF & G asserts that this court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds ten thousand dollars and that there is complete diversity. As USF & G aligned the parties, there is complete diversity. Plaintiff USF & G is incorporated in Maryland with its principal place of business in Maryland. Defendant National Union is incorporated in Pennsylvania with its principal place of business in Pennsylvania. Defendant Cigna is incorporated in Connecticut with its principal place of business in Pennsylvania. Defendant Korman is incorporated in Pennsylvania with its principal place of business in Pennsylvania. The named individual defendants[3] are all citizens of Pennsylvania except one who is a citizen of Georgia.

■ Korman contends, however, that Cigna and National Union should be realigned as plaintiffs, which would destroy complete diversity. Although it may destroy complete diversity, realignment is proper when there is no actual, substantial controversy between parties on one side of the dispute and their opponents. *American Motorists Insurance Co. v. Trane Co.*, 657 F.2d 146, 149 (7th Cir.1981) (citing *Indianapolis v. Chase National Bank*, 314 U.S. 63, 69, 62 S.Ct. 15, 16, 86 L.Ed. 47 (1941)).

■ In this case, realignment is not necessary because there is an actual, substantial controversy between plaintiff USF & G and defendants Cigna and National Union.

To be sure, on this motion, the insurers all make similar arguments concerning the absence of any coverage and share an interest in a finding that none of the insurers owe coverage. However, assuming a finding that at least one insurer owes coverage, the insurers' interests collide on the issue of which and how many insurers owe coverage. Since the insurers all provided coverage during different time periods, one divisive and major issue, already raised by the insurers, concerns when any possible coverage was triggered.

*Trane*, although not factually identical to this case, supports the proposition that insurers in the respective situations of USF & G, National Union, and Cigna are in substantial conflict. In *Trane*, the first-level excess insurer, American Motorists, brought suit seeking a declaration of the rights and liabilities of the four insurers. American Motorists named the insured and the other three insurers, Employers (primary carrier), St. Paul (second-level excess insurer), and American Home (third-level excess insurer), as defendants. Upon American Home's motion, the district court realigned Employers as a plaintiff, thereby destroying diversity jurisdiction. The district court noted that American Motorists was arguing that the underlying complaint did not allege an "occurrence" under either its policy or Employers' and that, therefore, neither insurer owed coverage. From this, the district court concluded that the insurers' "attitudes [were] insufficiently in conflict." *Trane*, 657 F.2d at 150 (quoting the district court's opinion).

The Seventh Circuit Court of Appeals reversed, concluding that there was a substantial conflict between Employers and American Motorists. The Seventh Circuit reasoned that "[b]ecause Employers is the underlying insurer, American Motorists would benefit from a holding that Employers had a duty to defend [the insured]. Conversely, if Employers were found not to be liable, American Motorists would then

---

**3.** The named individual defendants in this action are the same people who are plaintiffs in the *Smalls* lawsuits and are identified in paragraphs 6 through 101 of USF & G's First Amended Declaratory Judgment Complaint.

have the burden of proving that it had no duty to defend [the insured]." *Id.*

Having determined that this court has subject matter jurisdiction over this action, I must now decide whether the insurers have a duty to defend Korman. The insurers must defend Korman if the claims set forth in the *Smalls* complaints potentially come within the policies' coverage. *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 760 (3d Cir.1985); *see also American Contract Bridge League v. Nationwide Mutual Fire Insurance Co.*, 752 F.2d 71, 75 (3d Cir.1985). The insurers' policies cover

> damages because of
> A. bodily injury or
> B. property damage to which this insurance applies, caused by an occurrence.

This coverage is subject to various exclusions. Accordingly, the insurers have no duty to defend Korman if none of the allegations are covered because they do not allege "bodily injury or property damage caused by an occurrence" or fall within the ambit of one of the various exclusions.

Count Seven does not allege "bodily injury or property damage caused by an occurrence" because it does not allege an "occurrence." The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."[4] Count Seven alleges intentional misrepresentation and does not allege any other factual basis for liability. Intentional acts, including intentional misrepresentations, are not "accidents" and thus not "occurrences." *Gene & Harvey Builders v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (1986). Thus, Count Seven is not covered by the insurers' policies.

Count Nine, on the other hand, does allege liability for an "occurrence." Kor-man's breach of contract, as alleged in Count Nine, was not necessarily intentional. The *Smalls* plaintiffs simply allege that Korman breached its implied and express warranties in that the location of the homes and the leaching decreased the value of the homes. The plaintiffs do not allege in Count Nine that Korman knew, when making the warranties, that the leaching would occur or that Korman intended to breach the warranties. Rather, the allegations leave open the possibility that the leaching was accidental and unexpected by Korman.

Count Nine arguably also alleges "bodily injury or property damage." The policies define property damage as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
> (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

In Count Nine, the Class I plaintiffs seek damages for their properties' loss in value due to, inter alia, the leaching from the landfill of "hazardous and toxic wastes" and "residue from solid wastes ... into ground and surface waters on or adjacent to the landfill." (*Smalls I:* ¶ 227 (unnumbered) (b)(ii) specifically incorporating ¶ 189; *Smalls II:* ¶ 247 (unnumbered) (b)(ii) specifically incorporating ¶ 209). Also in Count Nine, the plaintiffs allege that Korman breached its contracts with the Class I plaintiffs in that the landfill, inter alia, "gave off noxious odors, gases, and fumes." These allegations in Count Nine perhaps suggest that the *Smalls* plaintiffs intend to prove that their properties lost value because the leaching and giving off of gases and fumes actually physically injured the properties.

Count Nine also includes allegations of what could arguably be considered "bodily

---

4. Cigna's first three policies had a slightly different definition of "occurrence." The definition in those policies included the words "during the policy period" between the words "in" and "bodily."

injury." The policies define "bodily injury" as

> bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

In Count Nine, the *Smalls* plaintiffs seek damages "for costs of medical monitoring made necessary by their exposure to the health and safety risks concealed by defendants" and for emotional distress. While the allegation of emotional distress certainly does not rise to the level of "bodily injury," *Young v. United States Fidelity Guaranty Co.*, No. 86–6832, slip op. at 8 (E.D.Pa. July 29, 1987), *aff'd*, 841 F.2d 1121 (3d Cir.1988), the allegation of exposure to health and safety risks may rise to that level. *See Techalloy Co. v. Reliance Insurance Co.*, 338 Pa.Super. 1, 487 A.2d 820 (Pa.Super.1984).

In *Techalloy*, a case involving somewhat similar allegations of exposure, the Pennsylvania Superior Court determined in dictum that the complaint in an underlying action alleged "bodily injury" within the meaning of a comprehensive general liability policy. There the insured had been sued for allegedly dumping and storing chemicals recklessly. The court reasoned that "[s]ince the ... complaint alleged exposure to, ingestion and use of water contaminated with a highly-dangerous chemical capable of causing severe physical damage, there were sufficient allegations of personal injury to render the complaint at least potentially within the policy's coverage." *Id.* at 826.

Although in Count Nine the *Smalls* plaintiffs may allege an "occurrence" and arguably allege "property damage" or "bodily injury," these allegations are not covered because they undoubtedly fall within the ambit of exclusion (f). Therefore, it is unnecessary to decide whether plaintiffs have alleged an occurrence causing property damage or bodily injury. Exclusion (f) precludes coverage for

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Any property damage alleged falls within the ambit of exclusion (f) because it allegedly arose out of the leaching of hazardous and toxic wastes and residue from solid wastes and from the giving off of "noxious odors, gases and fumes." Any bodily injury alleged, *i.e.*, exposure to health and safety risks, likewise cannot be covered. The only thing alleged in Count Nine to which the plaintiffs could have been "exposed" is the same leaching of wastes and giving off of odors, gases, and fumes.[5]

While exclusion (f) provides that it "does not apply if such discharge, dispersal, release or escape is sudden and accidental," the *Smalls* plaintiffs do not allege, and nothing in their complaints suggests, that the leaching and giving off of fumes was sudden.[6] On the contrary, the *Smalls* plaintiffs allege the following. In the general averments, the plaintiffs allege that, *from 1956 through 1984*, the landfill "continuously" violated federal and state law by, inter alia, "continual dumping at the site ... [c]ausing residues from solid wastes to be released into the soil ... [c]ausing hazardous waste to be released into soil, surface waters, and groundwaters ... [c]ausing smoke, noxious odors, and gases, including methane gas to be re-

---

**5.** The same analysis could be used to show that any "property·damage" or "bodily injury" arguably alleged in Count Seven also falls within the ambit of exclusion (f). Count Seven contains the same allegations of "property damage" and "bodily injury" as does Count Nine.

**6.** The term "sudden" is not synonymous with the term "accidental." Thus, contrary to Kor-

man's suggestion, all toxic discharges caused by occurrences, which by definition are "accidental," are not necessarily *"sudden and accidental."* Rather, toxic discharges may be caused by occurrences while at the same time fall within the ambit of exclusion (f) because they are not sudden.

leased into the atmosphere." Also, the plaintiffs allege that "[b]eginning in 1969," certain of the defendants "were cited on numerous occasions by the Pennsylvania Department of Environmental Resources for illegal disposal of wastes." The plaintiffs further allege that "[a]fter repeated violations, citations, and contempt orders, the Delaware County Court of Common Pleas ordered the Clearview Landfill closed on August 7, 1973.... Subsequent to this Order [certain of the defendants] continued to dispose waste and permit disposal of wastes at the Clearview Landfill." These allegations make clear that the *Smalls* plaintiffs are alleging that the leaching and giving off of fumes was not sudden but, rather, occurred continually over a long period of time.

Several courts considering similar allegations of discharges occurring over a period of time have also concluded that the discharges were not "sudden" within the meaning of exclusion (f). *Techalloy Co. v. Reliance Insurance Co.*, 338 Pa.Super. 1, 487 A.2d 820 (Pa.Super.1984); *Centennial Insurance Co. v. Lumbermens Mutual Cas. Co.*, 677 F.Supp. 342 (E.D.Pa.1987); *American Mutual Liability Insurance Co. v. Neville Chemical Co.*, 650 F.Supp. 929 (W.D.Pa.1987); *Fischer & Porter Co. v. Liberty Mutual Insurance Co.*, 656 F.Supp. 132 (E.D.Pa.1986).

In *Techalloy*, the insured had been sued in an underlying action for allegedly dumping and storing chemicals recklessly. The court, construing a comprehensive general liability policy, held that the insurer had no duty to defend the insured because the exclusion for toxic discharges precluded coverage. The court reasoned that the plaintiff in the underlying action did not allege a sudden event, but rather identified "the source of the problem as contamination which occurred on a 'regular or sporadic basis from time to time during the past 25 years.' " *Techalloy*, 338 Pa.Super. 1, 487 A.2d at 827.

In *Centennial*, the insured, which generated industrial waste, contracted with a waste hauler to dispose of its waste during November 1976 and May 1977. One of the main dumping sites used by the waste hauler (Wade site) was investigated by the United States government. The government brought an action under CERCLA against, among others, the insured alleging that the depositing at the Wade site had endangered health and environment.

The court, construing a comprehensive general liability policy, held that the exclusion for toxic discharges precluded a duty to defend because the record did not reveal facts that would indicate that the discharge of waste was sudden. *Centennial*, 677 F.Supp. at 349. The court reasoned that "[the insured's] waste was released onto the Wade site on numerous occasions over a thirteen month period. This court cannot characterize continuous activity such as this as sudden." *Id.* at 348.

In *American Mutual*, the insured owned, operated and maintained a chemical manufacturing facility on the same island on which the plaintiff in two underlying actions drilled water for consumption by its customers. According to the underlying complaints, the insured dumped hazardous waste into a pit and spilled, leaked and/or dishcarged chemical pollutants on the island's surface. The dumping and spillage allegedly contaminated the ground water.

The court held that the "pollution exclusion" precluded a duty to defend because the alleged contamination could not be considered "sudden." The court reasoned that the insured had allegedly engaged "in continuous pollution of the groundwater as a regular course of business." *American Mutual*, 650 F.Supp. at 933. The court noted earlier that the complaints alleged that the insured used the pit "for disposal of chemical pollutants continually from sometime prior to 1964 to 1979." *Id.* at 932.

In *Fischer*, the court construed a comprehensive general liability policy. The EPA had sued the insured alleging that the insured had caused the contamination of groundwater under one of its sites by a chemical known as TCE. After settling the suit by agreeing to allow for the water's purification, the insured brought an action seeking coverage from its insurer.

The court granted summary judgment for the insurer, holding, inter alia, that the "pollution exclusion" precluded coverage because the insured had "not averred or undertaken to prove that there was a causative sudden event or series of events." *Fisher*, 656 F.Supp. at 140. The court reasoned that the regular practice of the insured's employees of pouring TCE down drains causing leaching into groundwater could not be considered a sudden event. *Id.*

■ In addition to exclusion (f), exclusions (n) and (o) also preclude coverage for the property damage arguably alleged in Count Nine. Exclusion (n) precludes coverage for "property damage to the Named Insured's products arising out of such products or any part of such products." Exclusion (o) precludes coverage for "property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." The property damage arguably alleged in Count Nine concerns damage to Korman's product and/or work performed (*i.e.*, the New Philadelphia properties) and arises out of part of Korman's product and/or work performed (*i.e.*, Korman's choice of location for its residential development).

The Pennsylvania Supreme Court's decision in *Gene & Harvey Builders v. Pennsylvania Manufacturers' Ass'n Insurance Co.*, 512 Pa. 420, 517 A.2d 910 (Pa.1986), supports the proposition that Korman's choice of location for its residential development was part of its product and/or work performed. In *Gene & Harvey*, the owner of a parcel of land hired a contractor, the insured, to construct a house on the land. After the house was completed, the land subsided, causing damage to the house. The owner sued the insured alleging, inter alia, that the contractor performed the construction negligently and in an unworkmanlike manner.

The court, construing a comprehensive general liability policy, held that the alleged negligence was excluded from coverage because it fell under both exclusions (n) and (o). As to exclusion (n), the court reasoned as follows:

> [A]ll the claims concern damage to the insured's product (the house) arising from *a part of the product,* i.e., a builder's duty to be reasonably prudent in the placement of a house. One does not contract for the building of a house in the sky; of necessity, houses must rest on the earth. Assumed is that part of the contractor's work product will be to act prudently in placing the house on the lot. Reasonable inspection of the lot and representing the condition of the lot to the owner are, in short, part of the work of building a house, which is the "product" of a contractor.

*Id.* at 913–14 (emphasis in original). As to exclusion (*o*), the court reasoned:

> [A]ll the negligence assertions in the complaint concern damage to the work (the building of the house, i.e., a building fit for habitation) arising out of any portion of the work—using reasonable care to inspect the ground to see that it is normally sound, filling in holes which were present in the ground, and representing to the homeowner-buyers that the land had or did not have certain characteristics.

*Id.* at 914.

For the above reasons, I conclude that the insurers' policies do not cover the allegations contained in Counts Seven and Nine of the *Smalls* complaints. Counts Seven and Nine contain the only allegations of the complaint against Korman. I hold, therefore, that the insurers have no duty to defend or indemnify Korman.

### ORDER

For the reasons stated in the accompanying memorandum opinion, it is ordered as follows:

1. Judgment on the pleadings is granted in favor of CIGNA Property and Casualty Insurance Company and against The Korman Corporation and the named individual defendants. It is declared that CIGNA Property and Casualty Insurance Company has no duty to defend or indemnify

The Korman Corporation in the *Smalls* lawsuits.

2. Judgment on the pleadings is granted in favor of National Union Fire Insurance Company and against The Korman Corporation. It is declared that National Union Fire Insurance has no duty to defend or indemnify The Korman Corporation in the *Smalls* lawsuits.

3. Judgment on the pleadings is granted in favor of United States Fidelity & Guaranty Company and against The Korman Corporation and the named individual defendants. It is declared that United States Fidelity & Guaranty Company has no duty to defend or indemnify The Korman Corporation in the *Smalls* lawsuits.

4. The Korman Corporation's motion for judgment on the pleadings is denied.

5. The remaining claims, cross-claims, and counterclaims are dismissed.