557 A.2d 393

**LOWER PAXON TOWNSHIP, Appellee,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 7, 1988.

Filed April 3, 1989.

F. Lee Shipman, Harrisburg, for appellant.

Richard H. Wix, Harrisburg, for appellee.

Before BECK, KELLY and HESTER, JJ.

BECK, Judge:

This is an appeal from a judgment entered on a verdict for appellee Lower Paxton Township (the "Township") in its action for coverage under a comprehensive general liability

policy issued by appellant United States Fidelity and Guaranty Company ("USF & G") to the Township. The Township sought coverage for various expenses it incurred in remedying a problem arising from methane gas that was emanating from a landfill owned by the Township.

Although numerous issues are presented, the dispositive issue concerns the proper construction of the policy's pollution exclusion and the application of this exclusion to the facts of this case. The pollution exclusion excludes coverage for any bodily injury or property damage arising out of the discharge, dispersal, release or escape of pollutants, including gases, unless the discharge, dispersal, release or escape is "sudden and accidental."

Since we find that there is no record evidence that could lead a jury reasonably to find that the methane gas dispersal that gave rise to the Township's claimed damages was "sudden", we grant judgment n.o.v. in favor of USF & G. The basis for this decision is our punctilious review of the record, which we have conducted with constant vigilance to our limited duty in reviewing a denial of judgment n.o.v.:

> ... the sole duty of the appellate court is to decide whether there was sufficient evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably to be drawn from the evidence and rejecting all unfavorable testimony and inferences.

*Walasavage v. Marinelli,* 334 Pa.Super. 396, 483 A.2d 509, 514–15 (1984).

Viewed in this manner, the record reveals the following facts. In 1961, the Township began operating a sanitary landfill located in the southeast portion of the Township. The landfill occupies approximately 35 acres. Along the northern border of the landfill is Conway Road, with homes located on both sides of the road. One of these homes, 6621 Conway Road, is owned by Mr. and Mrs. Fleming. The Fleming home is located between the northern edge of the landfill and Conway Road.

A by-product of the natural decomposition of organic material in the refuse buried at the landfill is methane gas, an odorless, colorless gas that ventilates into the atmosphere through the cover soil on the landfill or migrates laterally underground. The record contains the following description, authored by the Township's engineering firm, of the process through which methane gas forms and enters the atmosphere:

> Organic components of landfilled solid waste decompose by a combination of biological, chemical and physical processes. Within the confines of a landfill, these processes occur simultaneously. The composition of landfill gas develops through an evolutionary process as waste experiences first aerobic (characterized by the presence of free oxygen) and then anaerobic (featuring the lack of oxygen) environments. The major constituents of landfill gas are methane and carbon dioxide.... After six months to a year, methane gas concentrations in the landfill gases rise to about 45 to 50 percent, remaining relatively constant through the period of active gas production. Gas production, and its methane component, will take many years to complete and is principally dependent upon refuse composition and moisture content. It is generally accepted that typical landfills, containing mostly municipal solid waste, will produce gas for between 20–40 years....

Methane gas can explode at certain concentrations and can adversely affect the health of those exposed to it at even lower concentrations.

During the 1970's, the Township became aware of the phenomenon of methane gas production at landfills, but was not aware of any specific problem with methane gas migrating from its own landfill and had taken no steps to control any such possible migration. However, by letter dated May 4, 1981, the Department of Environmental Resources notified the Township that methane gas was migrating off the

landfill at dangerously high levels.[1] The Township immediately hired Gannett Fleming Corddry and Carpenter, Inc., an engineering firm, to evaluate gas production and migration at the landfill. Their initial report, dated August 11, 1981, indicates that Gannett Fleming's testing revealed strong concentrations of gas at the north end of the landfill, along Conway Road. The report further states that these tests are a "... strong indication of LFG [gas] migration across Conway Road toward the nearby residential community."

Gannett Fleming recommended the immediate installation of a gas migration control system along the northern edge of the landfill. This system, which was installed in the spring of 1982, consisted of a perforated pipe laid horizontally in a trench of crushed stone and a standpipe to vent the collected gas into the atmosphere.

This perforated pipe system, sometimes referred to as a trench barrier, was recommended by Gannett Fleming as a first step toward addressing the gas problem at the landfill. Gannett Fleming's August 11, 1981 report also recommended that additional venting be installed at locations all over the fill and, after monitoring of the gas production at these vents, that a "... permanent [gas] collection and control system be designed."

During the remainder of 1982, Gannett Fleming, the Township, and the Township's own engineers, Herbert, Rowland and Grubic, Inc. (the "Rowland firm"), continued to monitor and study the methane gas situation at the landfill. Gannett Fleming monitored the gas production at sites all over the fill, largely to ascertain whether it would be advisable for the Township to install a system of gas collection so that the gas could be sold for commercial use. Both Gannett Fleming and the Rowland firm also monitored the gas situation at the north end of the fill to determine the effectiveness of the trench barrier. Although the

1. DER regularly checked landfills to assess levels of methane gas production and to test for migration of the potentially dangerous gas off the landfill. The May 1981 letter to the Township was occasioned by one of these spot checks.

Township expected that the barrier would be effective in controlling gas migration in that area, as of October 22, 1982 Gannett Fleming preliminarily reported to the Township that its monitoring of the fill indicated only that "... the trench barrier is moderately effective in controlling the gas migration northward toward Conway Road." This report indicates that gas readings at probe G–6, the one closest to the Fleming home, ranged from 15% to 0% in the period from June 22, 1982 to September 14, 1982.

The Rowland firm's own test results were reported to the Township on December 10, 1982. This report includes testing data from October and November of 1982, when gas was consistently detected at Probe G–6. In October the gas levels ranged from 15% to 25% and in November from 18% to 27%. The report also included the Rowland firm's recommendations regarding the methane gas problem, including the following:

We recommend that several additional monitoring points be established to further evaluate this area. These probes should be installed at the north side of Conway Road, and we recommend that 3 additional probes be installed on private property at 6621 Conway Road [the Fleming home] to monitor any possible migration.

At trial, Mr. Rowland, the author of the foregoing report, testified that he recommended the installation of these additional probes because of his concern for possible migration in that direction. He was also concerned that the Township still did not know exactly where the outer limits of the fill itself were and had only recently discovered that some waste was actually located under Conway Road, whereas the Township had long thought that the fill material stopped at the edge of the road. Mr. Rowland wanted to ascertain whether there was waste extending even further past the trench barrier and the road, since any such waste could be emitting gas that could not be controlled by the trench barrier.

On December 15, 1982, just five days after the Rowland firm report was submitted, the Department of Environmen-

tal Resources notified the Township that the basement of the Fleming home contained a dangerous level of methane gas. Shortly before December 15th, the DER had received an anonymous telephone call indicating that the caller had been in the Fleming home and had smelled gas.[2] DER could not immediately identify where the Fleming home was, since the caller had mistakenly stated that it was located in a different township. When DER finally ascertained that the property was in Lower Paxton, and was in fact at the edge of the landfill, they immediately tested the Fleming home and found a 28% level of gas in the basement.

The Township immediately made expenditures to correct the problem in the Fleming home, including sealing the basement and installing vents around the foundation of the home. An inspection of the basement revealed a sump pump in the basement floor lined with an old coal bucket which had rusted through. It was thought that this opening in the cement floor had provided the opening through which the gas had entered the home. There was no testimony or any other evidence as to when the bucket had rusted, nor was there evidence of any abrupt opening of the bucket or of any other abrupt event at the home that could have released the gas from the underlying soil.

The total cost of correcting the gas problem at the Fleming home was approximately $8,000. However, the Township thereafter also expended substantially larger sums in remedying the methane gas problem in the landfill as a whole, including amounts paid for engineering studies as to how to remedy the problem, testing the landfill to assess the problem, and installing a gas migration control system. The total amount expended, excluding engineering services, was slightly in excess of $200,000.

The Township notified USF & G of the methane gas problem at the Fleming home on December 27, 1982. They also notified USF & G that the Township was concerned

2. As was noted at trial, the fact that the caller reported the *smell* of gas is curious, since methane gas is odorless.

about the potential for numerous other claims against the Township arising from the gas emanating from the landfill.[3]

USF & G denied coverage based on several grounds, including the pollution exclusion. This lawsuit ensued. The Township's complaint alleged that the event that triggered coverage was the migration of methane gas into the Fleming property. The complaint specifically alleged that the migration occurred "suddenly and without warning" on or about December 15, 1982. Following a jury trial, a verdict for the Township in the amount of $212,000 was returned. This amount represented all of the Township's expenditures in remedying the problem at the Fleming home, as well as the entire expense of installing a gas control system over the landfill as a whole. The only item claimed by the Township that was not recovered was $77,-000 expended for engineering services related to the fill. USF & G's post-trial motions, including both a request for judgment n.o.v. and a new trial, were denied and judgment for the Township was entered.

USF & G raises numerous issues for our review, all of which can generally be characterized as falling into two categories. First, USF & G contends that the terms of the policy exclude coverage for amounts paid by the Township as a result of an event like the one that occurred at the Fleming home because the migration of gas into the home was not sudden and accidental. Second, USF & G argues that even assuming coverage for damages directly arising from the event at the Fleming home, the Township cannot possibly recover for all of its expenditures to remedy the methane gas problem at the landfill as a whole. At most, USF & G argues, the Township is only covered for those expenditures made to remedy the problem at the Fleming home. Since we are persuaded by one of USF & G's arguments in the first category, i.e. that any damages arising from the event at the Fleming home, whether directly or indirectly, are excluded from coverage under the

---

3. In fact, the record reveals that no other claim has ever been made against the Township as a result of the gas problem.

pollution exclusion, we need not address the remaining issues.

We necessarily begin with a review of the pertinent policy provisions, since the central question presented is one of contract interpretation. The interpretation of a contract, including interpretation of a contract of insurance, is a matter of law for the court. *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n. Insur. Co.,* 512 Pa. 420, 517 A.2d 910 (1986). Unless we first determine what the pertinent policy language means, we cannot determine whether USF & G is entitled to judgment as a matter of law in applying that language, as we have construed it, to the evidence of record.

Prior to analyzing the insurance contract, however, we must note that both parties to this appeal have been joined by amici curiae who have thoroughly briefed the issues. Some of these amici have also expended considerable effort in arguing the respective public policies that support their positions. Those favoring the insured urge upon us the prospect of municipal governments crumbling under the financial strain of environmental liabilities. Those favoring the insurer express concern over the effect of granting coverage on potential polluters, who may be less concerned about protecting the environment if they know that any resulting damages will be borne by their insurers.

We must reply to these concerns as did the Appellate Division of New Jersey in addressing similar "policy" arguments made in the context of a pollution coverage case:

> ... we underscore the limited nature of our inquiry. Whatever the relative merits of the competing public policies ... we perceive no legal principle which would permit us to circumvent what the contract says. So it throws no light to inveigh against the "collapse of the pollution insurance market" ... or, on the other hand, to argue that protection of "blameless victims" is best served by seeking to spread the financial risk.... Our role is merely to interpret the language of the insurance contract.

*Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987).

The insurance contract in question is a standard comprehensive general liability policy, containing the following basic insuring agreement:

I. The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

bodily injury or

property damage

to which this insurance applies, caused by an occurrence, and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises,....

The policy defines "occurrence" as follows:

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

The policy also contains the following pollution exclusion: This insurance does not apply: ...

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or other water course or body of water; but this exclusion does not apply if such discharge, dispersal, escape or release is sudden and accidental;

It is the meaning of this exclusion, and particularly of the phrase "sudden and accidental", that lies at the center of the instant dispute. USF & G and its amici curiae argue that the plain meaning of this phrase requires that damages resulting from gradual releases of pollution are excluded from coverage. Applying this interpretation to the facts of this case, USF & G argues that under any

construction of the evidence, the pollution in question was gradual and judgment n.o.v. in USF & G's favor is required.

Although the trial court accepted this interpretation of the policy, it refused to accede to USF & G's request that the case be removed from the jury and decided in favor of USF & G as a matter of law on the ground that there was no evidence of a sudden release or discharge of pollutants. Accordingly, the case went to the jury with the following instruction:

> The burden is not on the defendant [USF & G] to prove that in this case the alleged escape or release was not sudden or accidental. The plaintiff has the burden of proof.... It must prove that there was a sudden and accidental release of pollutants. They must prove it was both sudden and accidental. There are two words here. Now, how are those words defined. They are defined in the law pretty much as you would have found them in ordinary life in construing them. The dictionary definition, sudden is an event that occurs abruptly. It implies a distinct happening at a particular time. An occurrence, assignable to a single act identified in space and time with reasonable certainty. Of course the alleged sudden act in this case was the incident that occurred at the Fleming residence so far as the presence of migrating methane gas. Accident is an event that takes place without one's foresight or expectation. It is an undesigned, unexpected event. The term accident within the meaning of an insurance policy is an event happening by chance unexpectedly taking place. It is the opposite of something likely to occur, foreseeable in due course. These are the definitions of these terms.

The Township argues that even if we construe the pollution exclusion as the trial court did and require that the discharge of pollutants be *both* sudden, defined to mean abrupt and lasting only a short time, *and* accidental, defined to mean unexpected, the evidence in this case supports the jury's finding of coverage. However, the Township's main argument is that the pollution exclusion is ambiguous

and must be construed against the insurer. The Township urges us to construe the exclusion to exclude coverage only in cases of intentional pollution, i.e. where the pollution is either expected or intended by the insured. Whether the pollution discharge is sudden or gradual would be irrelevant. Thus, the Township urges us to affirm the trial court on the alternative ground that the evidence overwhelmingly supports the conclusion that the dispersal of methane gas into the Fleming home was neither expected nor intended by the Township.

The meaning of the pollution exclusion has been the subject of numerous cases decided in the past decade. An ever-increasing number of courts have rejected the insured's ambiguity argument and have found that sudden and accidental has a clear plain meaning that excludes coverage not only for intentional pollution but also for any unintentional release or dispersal of pollution that occurs gradually over time. *See, e.g., United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988); *United States Fidelity & Guar. Co. v. The Murray Ohio Mfg. Co.,* 693 F.Supp. 617 (M.D.Tenn.1988); *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987); *Claussen v. Aetna Casualty & Sur. Co.,* 676 F.Supp. 1571 (S.D.Ga.1987) (appeal pending, No. 87–8972 11th Cir.); *International Minerals & Chem. Corp. v. Liberty Mutual Ins. Co.,* 168 Ill.App.3d 361, 119 Ill.Dec. 96, 522 N.E.2d 758, *app. den.,* 122 Ill.2d 576, 125 Ill.Dec. 218, 530 N.E.2d 246 (1988). In fact, it has recently been noted that "... there is an emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambiguous...." *Technicon Electronics Corp. v. American Home Assurance Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91, 96 (2d Dept.1988).

Pennsylvania precedent on this issue is limited, but to the extent that it exists, it is consistent with the view that the pollution exclusion is not ambiguous. As early as 1984, this court was confronted with interpreting the pollution exclusion in *Techalloy Company, Inc. v. Reliance Insurance*

*Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984), *allocatur denied,* 338 E.D.Allo.Dkt.1985 (Pa. Oct. 31, 1985). In *Techalloy,* the insured (Techalloy) had been sued for allegedly recklessly dumping or storing Trichloroetheline (TCE), a chemical Techalloy used in its steel business, which allegedly could cause severe injury to the plaintiff class who had been exposed to the TCE. Techalloy's insurer, Reliance, refused to defend or indemnify, relying in part on the pollution exclusion. Techalloy defended the suit at its own expense, won and sued Reliance for the costs of defense.

The *Techalloy* court began its analysis with the following statement of applicable principles of insurance policy interpretation, with which we concur:

Words of an insurance policy which are unambiguously written should be construed according to their plain and ordinary meaning. *Pennsylvania Manufacturers' Ins. Co. v. Aetna Casualty and Surety Ins. Co.,* 426 Pa. 453, 457, 233 A.2d 548, 551 (1967), and we should give effect to the language. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). If, however, a term is susceptible to two interpretations or subject to reasonable question, it should be liberally construed in favor of the insured. *C. Raymond Davis & Sons, Inc. v. Liberty Mutual Ins. Co.,* 467 F.Supp. 17, 20 (E.D.Pa.1979); *Hofing GMC Truck, Inc. v. Kay Wheel Sales Co., Inc.,* 543 F.Supp. 414, 419 (E.D.Pa. 1982). Most importantly, in close or doubtful cases, we should find coverage for the insured, and if we err in interpreting a policy provision, we should err in favor of the insured. *Motley v. State Farm Mutual Automobile Ins. Co., Inc.,* 502 Pa. 335, 340, 466 A.2d 609, 611 (1983).

. . . .

While we are compelled to interpret the meaning of a term whose application was ambiguous, if the language of a policy is clear and unambiguous, we must apply its plain and ordinary meaning, and not struggle to create ambiguity solely for the purpose of finding coverage

where none exists. *Monti v. Rockwood Ins. Co.*, 303 Pa.Super. 473, 476, 450 A.2d 24 (1976).

*Id.* 338 Pa.Super. at 7, 12, 487 A.2d at 823, 826.

With these principles in mind, the *Techalloy* court analyzed the meaning of the pollution exclusion and the allegations of the underlying complaint against Techalloy to determine whether Reliance had erred in refusing to defend Techalloy. Noting that the complaint alleged only that Techalloy was responsible for pollution that occurred on a "regular or sporadic basis from time to time during the past 25 years," the court held that this allegation could in no way be construed to allege a sudden release, escape, discharge or dispersal of pollutants. The court found that the pollution exclusion "unambiguously states that there will be no coverage for toxic discharges into the environment unless that discharge is both sudden *and* accidental." (emphasis in original). Based on the allegations of the complaint and this interpretation of the policy, the court found that "[a]t best Techalloy could prove that the discharge was accidental", i.e. not intended or expected by Techalloy, but could not prove that it was also sudden. The court held that Reliance was justified in refusing even to defend Techalloy since there was no possibility that any damages Techalloy might have to pay would be covered. *Id.*, 338 Pa.Superior Ct. at 11–15, 487 A.2d at 826–27.

Thus, *Techalloy* established that the pollution exclusion is not ambiguous and must be accorded its plain meaning. That meaning is simply that damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected. *Techalloy* also strongly suggests that the burden of proving both of these requirements lies with the insured, since the court's discussion of the issue is framed entirely with reference to what Techalloy, the insured, would be able to prove regarding the nature of the release of the pollutant.

The *Techalloy* decision has been followed by several federal district courts applying Pennsylvania law. *See*

*American Mutual Liab. Ins. Co. v. Neville Chem. Co.,* 650 F.Supp. 929 (W.D.Pa.1987); *Fischer & Porter Co. v. Liberty Mutual Ins. Co.,* 656 F.Supp. 132 (E.D.Pa.1986) ("contamination that results from continuous dumping of toxic chemicals into drains ... or tanks that would, in turn, spill ... onto the ground is not sudden, even if one could argue that the spillage was accidental or the resulting damage unexpected"; burden of proving sudden and accidental is on insured).

Even more recently, in *United States Fidelity & Guaranty Co. v. The Korman Corp.,* 693 F.Supp. 253 (E.D.Pa. June 15, 1988), the District Court for the Eastern District of Pennsylvania applied *Techalloy* to facts similar to those presented in this case and determined that under the unambiguous meaning of the pollution exclusion, there was neither a duty to defend nor to indemnify.

In *Korman,* several insurers brought a declaratory judgment action seeking a determination of their defense and coverage obligations to Korman in connection with two class action suits that had been filed against Korman. The complaints in the class actions alleged numerous causes of action arising out of Korman's sale to the plaintiffs of homes located on the edge of a landfill. Plaintiffs alleged that Korman had caused them a variety of forms of damage by selling them the properties without informing them of the dangers and inconveniences posed by the landfill, which was allegedly leaching hazardous and toxic wastes and residue from such wastes, including gases, into the adjacent environment.

The *Korman* court carefully analyzed the provisions of the governing policies, which contain the selfsame insuring agreement and pollution exclusion as is involved in the instant case, and determined that insofar as the complaint alleged damages resulting from the gradual leaching of pollutants from the landfill, no duty to defend and no coverage existed. The court stated:

> Any ... damage alleged falls within the ambit of exclusion (f) [the pollution exclusion] because it allegedly arose

out of the leaching of hazardous and toxic wastes and residue from solid wastes and from the giving off of "noxious odors, gases and fumes." ...

While exclusion (f) provides that it "does not apply if such discharge, dispersal, release or escape is sudden and accidental," the ... plaintiffs do not allege, and nothing in their complaints suggests, that the leaching and giving off of fumes was sudden.[6]

[6] The term "sudden" is not synonymous with the term "accidental". Thus, contrary to Korman's suggestion, all toxic discharges caused by occurrences, which by definition are "accidental", are not necessarily *sudden and accidental."* Rather, toxic discharges may be caused by occurrences while at the same time fall within the ambit of exclusion (f) because they are not sudden.

*Id.* at 259. *See also Claussen v. Aetna Casualty & Sur. Co.,* 676 F.Supp. at 1580 (leaching of gases from landfill into adjacent areas is not sudden; pollution exclusion limits "coverage for pollution-related damages to situations where such damages are caused by sudden pollution incidents involving equipment malfunctions, explosions and the like").

The Township and its amici curiae urge us to depart from the foregoing line of cases. It is argued that we can and should reconsider the wisdom of *Techalloy* and those federal cases relying on it. The contention that we have the authority to reconsider *Techalloy,* by which we are bound, rests on the *Techalloy* court's passing reference to the fact that in that case, the insured did not offer any reasonable alternative interpretation of the pollution exclusion that would reveal an ambiguity. 338 Pa.Super. at 7, 12, 487 A.2d at 823, 826. Here, on the other hand, the Township is offering an alternative interpretation that the Township views as reasonable and indicative of an ambiguity.[4]

4. The Township cites *Cohen v. Erie Indemnity Co.,* 288 Pa.Super. 445, 432 A.2d 596 (1981) for the proposition that where a provision in an insurance policy has been construed in different ways by the various courts that have considered it, this alone mandates that we find the provision ambiguous. We reject this contention, as have other courts that have considered it in the context of the pollution exclusion itself. *See Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1323, n. 7 (E.D.Mich.1988).

We do not regard *Cohen* as mandating that we find an ambiguity wherever judicial decisions considering a policy provision are in

We do not consider ourselves free to disregard the clear import of *Techalloy* on the legal question of the meaning of the pollution exclusion. We are bound by the prior decisions of this court. Moreover, we do not find that the Township has offered us a reasonable alternative interpretation of the pollution exclusion which reveals an ambiguity. Our analysis of the arguments in favor of finding an ambiguity only further convinces us of the rectitude of the *Techalloy* court's conclusions. Thus, even if we could reject the *Techalloy* interpretation, we would not.

The primary analysis adopted by those courts that have found the pollution exclusion ambiguous, and which is urged on us by the Township, is that an ambiguity appears when the "sudden and accidental" exception to the exclusion is read in the context of the definition of a covered "occurrence." *See, e.g., United States Fidelity & Guar. Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139 (W.D.Mich. 1988), issues certified for appeal; *Buckeye Union Ins. Co. v. Liberty Solvents & Chem. Co.,* 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987).

Simply stated, the argument is that both the definition of an occurrence and the exception to the pollution exclusion are coverage provisions, and yet they are contradictory and confusing. The alleged ambiguity arises from the fact that the basic requirement for coverage is the existence of an occurrence as the event that causes the claimed damages.

conflict, with no regard for our own analysis of the provision or of the wisdom of these decisions. Surely we would be abdicating our judicial role were we to decide such cases by the purely mechanical process of searching the nation's courts to ascertain if there are conflicting decisions. The law of Pennsylvania is that we must find an ambiguity only where the policy is *reasonably* susceptible of differing interpretations. *Armon v. Aetna Sur. & Casualty Co.,* 369 Pa. 465, 87 A.2d 302 (1952). Thus, whether other courts have reached varying conclusions regarding the meaning of a policy is only relevant where the various meanings ascribed are reasonable. In this case, we find that those courts that have eliminated a temporal quality from the meaning of "sudden" have ascribed an unreasonable meaning to an unambiguous provision.

The policy defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Thus, an occurrence can occur gradually, as opposed to suddenly. The pollution exclusion, on the other hand, provides a separate specific requirement for coverage of damages resulting from pollution. It provides that all such coverage is excluded unless the polluting event giving rise to the damages is "sudden and accidental." Courts finding the pollution exclusion ambiguous have opined that the juxtaposition of these two different coverage requirements, i.e. the general requirement of an occurrence, which can be gradual, and the specific requirement applicable to a release of pollutants, which must be sudden, creates confusion in the policy.

As described by the United States District Court for the Western District of Michigan, the ambiguity arises as follows:

[t]o write a policy which includes a broad definition of occurrence ("continuous discharge") and where the exclusion clause is, in the main, coextensive with the definition of an occurrence and *then* to allow for a very narrow exception to the exclusion—that is, where the pollution is "sudden and accidental"—is, at the least, confusing, if not deceptive to the policyholder ... It invokes a "hidden meaning" as to what, if any, instances of "unintentional" pollution will be covered and what instances will be excluded.

*United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. at 1159.

Other courts have rested their conclusion that the pollution exclusion is ambiguous on the ground that the word sudden itself has no clear plain meaning and is not specifically defined in the policy. For example, in *New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987), the court opined that the "primary" definition of sudden is "happening without previous

notice" or "occurring unexpectedly." The fact that other definitions of sudden stress its temporal quality and define it to mean abrupt only convinced the court that the word is ambiguous. Thus, the *New Castle* court concluded that sudden must be interpreted against the insurer to mean only unexpected, i.e. the pollution discharge must only have been accidental to be covered. The fact that it may have also been gradual does not defeat coverage. *Id.* at 1362.

On the surface, these arguments appear to be the result of a close reading of the entire policy and a faithful application of the precise dictates of the English language. On closer inspection, they are revealed to be just the opposite. Acceptance of these arguments would result in the emasculation of the policy in violation of our duty to enforce it. Abraham, K.S., *Environmental Liability and the Limits of Insurance,* 88 Col.L.Rev. 942, 962 (1988). As several courts have noted, the pollution exclusion's language is ". . . clear and plain, something only a lawyer's ingenuity could make ambiguous." *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987) (quoted with approval in *United States Fidelity & Guar. Corp. v. Star Fire Coals, Inc., supra* ).

The juxtaposition of the occurrence provision and the pollution exclusion creates no confusion in the policy. As the Court of Appeals for the Sixth Circuit recently stated:

> We have no difficulty reconciling the two provisions. We believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the *discharge* was "sudden and accidental."
>
> We believe the everyday meaning of the term "sudden" is exactly what this clause means. We do not believe that is is possible to define "sudden" without reference to a temporal element that joins together conceptually the immediate and the unexpected. It must also be emphasized that the focus of this "sudden and accidental"

exception to the general pollution exclusion is on the nature of the discharge itself, not on the nature of the damages caused.

*Star Fire, supra,* at 34.

Commentators have similarly noted that the pollution exclusion can easily be construed according to its plain meaning and in a manner consistent with the definition of an occurrence:

> The combined meaning of the definition of "occurrence" and the "pollution exclusion" was that the policy afforded coverage against liability for bodily injury or property damage caused by continuous or repeated exposure to risks, unless that exposure was the result of any of the various forms of pollution detailed in the exclusion. Coverage against liability for damages caused by pollution exposures was excluded except when the exposure resulted from "sudden and accidental" pollution.

Abraham, *supra,* at 962.

Any other interpretation of the policy is blatantly unreasonable. To read "sudden and accidental" to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement—abruptness of the pollution discharge. The very use of the words "sudden *and* accidental" (emphasis added) reveal a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident", the inescapable conclusion is that "sudden", even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident". This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage. *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1325–26 (E.D.

Mich.1988).[5]

■ Having reaffirmed our confidence in the *Techalloy* interpretation of the pollution exclusion, we now turn to the application of the pollution exclusion as we have interpreted it to the facts of this case. The question is simply whether there was sufficient evidence to support the jury's conclusion that the Township had sustained its burden of proving that there was an abrupt discharge, dispersal, release or escape of methane gas into the Fleming home. This is the only pleaded sudden event in this case. There is no contention that the gas was produced by the landfill waste materials in an abrupt manner. It is undisputed that the gas is produced and emanates from the buried waste material gradually, leaching into the surrounding soil and atmosphere.[6]

We find no record evidence supporting the contention that the methane gas dispersed or was released into the Fleming

5. Amici curiae writing in support of the Township have provided this court with lengthy argument and documentary materials concerning the drafting history and regulatory approval process of the exclusion when it was first proposed in the early 1970's. Amicus seek to convince us that the Township's coverage-promoting interpretation of the exclusion is correct because it was the insurers' own interpretation at the time they drafted it and was the interpretation relied upon by insurance regulators in approving it.

We express no comment on these arguments. Having found the exclusion unambiguous on its face, we are bound to construe it in accordance with its plain meaning and may not refer to extrinsic evidence of the drafters' intent. *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1982); *Camp Joy, Inc. v. Commonwealth*, 70 Pa.Commw. 142, 452 A.2d 891 (1982). We also note that the documentary materials are dehors the record, having been presented for the first time on appeal.

6. Other cases involving the leaching of pollutants from landfills and construing the pollution exclusion to require an abrupt release of the pollutants have similarly concluded that the production and movement of the pollutants were gradual. *See, e.g., Korman, supra; Claussen, supra.* In this case, however, the Township has employed a novel approach to securing coverage. Conceding that the methane gas is produced gradually and migrates slowly, the Township has attempted to inject an element of suddenness by focussing on the specific release of gas into the Fleming home and pleading that this release was sudden, therefore triggering coverage. Unfortunately, there is no evidence to support this allegation.

home suddenly. The only facts available indicate that the gas had for some time been migrating in the direction of the home. Indeed, the area proximate to the home was the area where the DER first detected dangerous levels of gas in May 1981. The record also reveals the presence of gas near the home in the fall of 1982 after the trench barrier had been installed. Both Gannett Fleming and the Rowland firm's reports in early December of 1982 confirm the presence of gas at the test probe closest to the Fleming property.

There is no direct information concerning the presence of gas in the home itself prior to when the DER found it there on December 15, 1982 simply because no testing had been done on the Fleming property. Although the Township alleges that the gas suddenly entered the home on December 15, 1982, in reality this is only the date on which the gas was first detected there. The record is bereft of evidence indicating when or how the gas entered the home. In fact, the only inference the record would support on this point would be that gas had been entering the home for some time prior to December 15th. The record shows that the actual anonymous report of gas in the home was made to the DER some time before December 15th and that Mrs. Fleming had been experiencing headaches possibly due to exposure to the gas for several months prior to that date. This evidence leads to the conclusion that the gas entered the home as it entered any other area—gradually over time, leaching through the soil and up through the basement floor.

The record also does not support a conclusion that, although the gas may have slowly leached toward the home, it was then released into the home on December 15th through some abrupt rupture of the basement floor. The sum total of the evidence as to how the gas penetrated the floor was testimony from the Township that it was thought to have entered through a rusty coal bucket containing a sump pump. There was no evidence that the gas built up under the bucket and then was suddenly emitted into the

house through a rupture in the bucket or any other sudden breach of the floor.

The only evidence the Township points to in arguing "suddenness" is evidence that the Township never expected that the gas would enter the home, that the trench barrier was intended to prevent precisely this type of problem, and that Township officials were shocked to find the gas in the home on December 15th. This is irrelevant to whether the release of the gas into the home was sudden. It goes only to whether the Township intended or expected the gas to migrate as it did.

We find that there is insufficient evidence to support the jury's verdict. We reverse the judgment of the trial court and enter judgment n.o.v. for appellant. Jurisdiction is relinquished.