## Central Dauphin School District v. Pennsylvania Manufacturer's Association Insurance Co.

*Stuart L. Knade,* for plaintiff.
*Shawn P. Kenny,* for defendant.

DOWLING, *J.,* September 10, 1992—The history of the world has been shaped by unexpected events which could hardly be classified as accidental: the Greek repulsion of the Persian invasion in 499 B.C.; the Colonists' defeat of mighty England; the death of Emperor Frederick III of Germany which put the Kaiser on the throne and brought on World War I; the dastardly attack on Pearl Harbor by the perfidious Japanese; and the assassination of President Kennedy are but a few of such instances. We mention these occurrences because the key to plaintiff's position on the motion by defendant for summary judgment is the assertion that anything unexpected is an accident. This is quite an unsupportable proposition.

This is a suit on liability insurance policies issued by defendant Pennsylvania Manufacturer's Association Insurance Co. to plaintiff Central Dauphin School District covering the period July 1, 1981, to July 1, 1986.

One of the properties insured under these policies was the Middle Paxton Elementary School located in Middle Paxton Township, Dauphin County. The school was heated by a boiler that was installed in a 1958 addition to the school. Fuel oil for the boiler was stored in a 6,000 gallon underground oil storage tank which supplied oil to the school by way of an underground supply pipe line. Fuel oil supplied to the furnace which was not burned by the furnace was returned to the oil storage tank by way of an underground return pipe line. In answer to an interrogatory, plaintiff indicated that it believes that the fuel oil supply system was installed at the same time the boiler was installed in 1958.

On February 4, 1987, plaintiff was notified by the Pennsylvania Department of Environmental Resources that a well on an adjacent property owned by Bessie McElwee was found to be contaminated with oil. On February 14, it conducted a test on the oil storage tank and discovered that the underground return pipe was leaking oil through holes in the pipe. CD has indicated that prior to February 4th, it had no knowledge or reason to believe that the pipeline was or may have been leaking. The school district alleged that it has been responsible for the contamination resulting from the oil leakage and that through December 30, 1988, it expended approximately $126,000 for professional services in order to abate the contamination.

The policies of insurance issued to plaintiff contain the following exclusion:

"This insurance does not apply:

"(f) To bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapor, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water; but this exclusion does

not apply if such discharge, dispersal, release or escape is sudden and accidental...."

Defendant served expert interrogatories upon the plaintiff. In answer to these interrogatories, plaintiff indicated that its expert, Kent Littlefield, "will testify that in his opinion, the oil contamination emanated from the return line of the plaintiff's oil tank for the heating plant for the building. He may also testify as to other facts and opinions expressed in the report of R.E. Wright Associates Inc. which is already in defendant's possession." One of the reports from R.E. Wright is an "interim progress report" dated October 1987 which states that the known history of the leaking began on March 13, 1986, when Mrs. McElwee called Service Oil Co. to investigate a fuel oil odor in her house. Service Oil could find no leaks in the McElwee heating system, and the oil was attributed to nearby road resurfacing. The odor persisted, and on April 14, 1986, Service Oil collected a water sample from the home's well water which was tested by Wright Lab Services Inc. No fuel oil was detected. During the spring and summer of 1986, no fuel odor was noticed at the McElwee residence. The report from R.E. Wright goes on to state, however, that, "since the house was open, the fuel oil vapors may have been present but not concentrated enough to cause a detectable odor. By Christmas of 1986, the odor had returned, and on January 6, 1987, Service Oil conducted another investigation at McElwee's request and found no oil leaks. Service Oil inspected the home again on the 13th of January; and on the 20th of January, they collected another water sample. This time, the chemical analysis detected dissolved fuel oil...." On January 22, 1987, DER was notified; and its regional hydrogeologist discovered 1.5

inches of fuel oil on the water table of an unused hand dug well located in the floor of a crawl space beneath the McElwee kitchen.

At the request of DER, plaintiff retained Keystone Petroleum Equipment Ltd., to pressure test the tanks and connected piping to determine the presence of any leaks. Using the petrotite testing method, the company detected a four gallon per hour leak. As a result, the fuel oil tank and piping was excavated for inspection. The Wright report states, "it was evident from oil staining in the surrounding soils and the condition of the piping that the return line from the boiler to the underground storage tank had leaked, not the tank itself."

In paragraph 12 of its complaint, plaintiff alleged that the leakage of oil was a sudden and accidental occurrence, which it neither expected nor intended. In response to Interrogatory no. 14, plaintiff set forth all facts which it has to support this contention as follows:

"The school district did not expect nor intend for the leakage to occur. The school district did not intentionally cause the leakage to occur. The leakage occurred only when the heating plant of the building was actually operating."

In paragraph 30 of plaintiff's reply to new matter, plaintiff averred that it had made a determination regarding how the leak in the pipe occurred and when said leak occurred to the extent necessary. In Interrogatory no. 17, plaintiff was asked to state all facts which it has to support this contention; and plaintiff answered as follows:

"(a) the leak occurred through a hole in the return line from the heating plant to the exterior fuel tank. The hole was likely *caused by deterioration of the metal resulting from contact with soil, rock, elements, and*

*minerals.* The school district has been unable to identify *the date on which oil first leaked from the pipe.* However, leaking occurred only when the heating plant was actually operating, a finite number of times during the heating season. Central Dauphin School District believes that the leakage *was occurring* during the heating season of the fall of 1986 through the time the hole in the pipe was discovered." (emphasis supplied)

In defendant's Interrogatory no. 18, plaintiff was asked to set forth all facts and evidence which it has to support its contention that the contamination of the well occurred as a result of a sudden and accidental incident. Plaintiff answered as follows:

"(a) the contamination of the McElwee wells was sudden and accidental because it was not expected or intended that the wells would become contaminated with oil. Further, the wells are a defined space which became contaminated when oil first entered it."

In its response to defendant's request for production of documents, plaintiff provided the hand-written statement of Robert E. Swietzer dated March 6, 1987. Mr. Swietzer is employed by the Central Dauphin School District as coordinator of maintenance. In that capacity, he is in charge of the maintenance department for the entire school district and oversees the monitoring of energy consumption. Mr. Swietzer indicated that the head custodian at the school at the time was Linda Olsen, who was responsible for the daily operation of the boiler and who gathered all fuel oil data which was provided to Mr. Swietzer. Mrs. Olsen "stuck" the tank once per week to determine the amount of oil remaining in the tank. Mr. Swietzer indicated that they "have never noticed for four or five years any unusually high oil usage. There was nothing out of the ordinary." In addition, he indicated

that the first notice of a problem was a phone call in the very beginning of February 1987 which prompted them to stick the tank every day. During the month of February 1987, "there was no excess usage noted—it was even good."

The fuel oil tank and piping was removed from the ground by Keystone Petroleum on or about March 3, 1987. Mr. Swietzer indicated in his statement that the tank was fine with no trace of oil. He further indicated:

"The return pipe had several 'four or five' perforation type holes—about 1/4 inch in length by 1/16 inch in width. There was oil at these holes. The pipes were on solid shale. I feel it's (the pipe) been leaking for an unknown number of years, based on the oil usage and the minute holes in the pipe which is a return pipe. It could have been leaking for five years—perhaps."

The function of the court with regard to summary judgment proceedings is to determine whether a material issue of fact exists. *McDonald v. Marriott Corp.,* 388 Pa. Super. 121, 125, 564 A.2d 1296, 1298 (1989). Rule 1035(d) further provides that when a motion for summary judgment is supported as provided in the rule, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Accordingly, the non-moving party must produce sufficient competent evidence which would warrant submission of the claim to the jury. If, upon completion of discovery, plaintiff fails to produce evidence which, if believed, would justify a verdict in its favor, summary judgment is appropriate. "Our rules of civil procedure are designed

to eliminate the poker-game aspect of litigation and compel the players to put their cards face up on the table before trial begins." *Paparelli v. GAF Corp.*, 379 Pa. Super. 62, 68, 540 A.2d 597, 599 (1988).*

The seminal case on the construction of the "sudden and accidental" language is *Lower Paxton Township v. USF&G*, 383 Pa. Super. 558, 557 A.2d 393 (1989); in a scholarly opinion by Judge Beck, it was held that the "sudden and accidental" language was clear and unambiguous and must be accorded its plain meaning. The court noted that, "an ever increasing number of courts have rejected the insurer's ambiguity argument and have found sudden and accidental has a clear, plain meaning that excludes coverage not only for intentional pollution *but also for any unintentional release or dispersal of pollution that occurs gradually over time." Lower Paxton* at 569, 557 A.2d at 398. (emphasis added) The court also noted and reaffirmed its prior holding in *Techalloy Co. Inc. v. Reliance Insurance Co.*, 338 Pa. Super. 1, 487 A.2d 820 (1984), *allocatur denied* (1985).

The court noted that *Techalloy* "established that the pollution exclusion is not ambiguous and must be accorded its plain meaning. That meaning is simply that damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected. *Techalloy* also strongly suggests that the burden of proving both of these requirements lies with the insured, since the court's discussion of the issue is framed entirely with reference to what Techalloy, the insured,

---

* To some, this is rather regrettable, as it removes from the courtroom the drama, thrill and anticipation of a trial, replacing it with the fabricated, pre-determined, pre-cooked fare of a much rehearsed play.

would be able to prove regarding the nature of the release of the pollutant." *Lower Paxton, supra* at 571, 557 A.2d at 399.

The *Lower Paxton* court also quoted with approval the 6th Circuit's rationale on this issue:

"We believe the everyday meaning of the term 'sudden' is exactly what this clause means. We do not believe that it is possible to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected. It must also be emphasized that the focus of this 'sudden and accidental' exception to the general pollution exclusion is on the nature of the discharge itself, not on the nature of the damages caused." *Lower Paxton* at 576-77, 557 A.2d at 402, quoting *USF&G v. Star Fire Coals Inc.,* 856 F.2d 31, 34 (6th Cir. 1988).

Plaintiff relies on several decisions from New York which take a contrary view and suggest that our Superior Court erred in *Lower Paxton* and *Techalloy, supra,* in concluding that the phrase "sudden and accidental" is clear and unambiguous. If it did, we are hardly in a position to make a correction.

Plaintiff, in its brief, indulges in some philosophical waxing on what is sudden; and, like the earlier non sequitur of equating unexpected with accident, synonymizing it with unexpected. But, of course, all things sudden are not unexpected. Some may be. Plaintiff falls into the fallacy known in logic as the illicit major (or minor) premise.

"Thus: A sudden event is unexpected. .

"This was an unexpected occurrence.

"Ergo, it is sudden."

This might also be considered, according to Aristotle's sophistical refutations, as the converse fallacy of accident

in which an argument is improperly made from a special case to a general rule, i.e., the fact that some sudden events are unexpected does not mean that all unexpected events are sudden.

In applying these principles to the instant case, it seems beyond peradventure that the loss occurred because the pipes rusted through. Plaintiff itself has acknowledged that the holes in the return line were "likely caused by deterioration of the metal, resulting from contact with soil, rock, elements and minerals," and that, "leaking occurred only when the heating plant was actually operating ... occurring during the heating season of the fall of 1986 to the time the hole in the pipe was discovered." (plaintiff's answers to defendant's Interrogatory no. 17 - first set) Furthermore, the school district's records concerning fuel oil consumption refute any contention that the leak was sudden and accidental.

Accordingly, we enter the following

## ORDER

And now, September 10, 1992, the motion by Pennsylvania Manufacturers Association Insurance Co. for summary judgment is granted.