## Sunbeam Corp. v. Liberty Mutual Insurance Co. (No. 2)

C.P. of Allegheny County, no. GD95-13947.

*Andrew M. Roman,* for plaintiffs.

*Steven G. Adams, Douglas R. Grossinger* and *Walter M. Einhorn Jr.,* for First State Insurance Co.

*Larry A. Silverman, Michael J. Cohen* and *Kenneth Iwinski,* for Pennsylvania Manufacturers Association Insurance Co.

*Raymond Conlon, Frances T. Norek* and *Anne Froelich,* for Lexington Insurance Co.

*Joseph G. Manta* and *Thomas B. O'Brien Jr.,* for Liberty Mutual Insurance Co.

WETTICK, *J.,* April 2, 1997—Plaintiffs initially commenced this lawsuit through a complaint in equity. On July 17, 1996, I entered an opinion and order of court which sustained defendants' preliminary objections raising the existence of a full, complete, and adequate nonstatutory remedy. See *Sunbeam Corporation v. Liberty Mutual Insurance Company,* 144 P.L.J. 491 (1996). With the consent of the court, plaintiffs filed an amended complaint in law. This amended complaint contains 10 counts in assumpsit/trespass. Defendants have filed preliminary objections in the nature of a demurrer to each of the counts. These preliminary objections are the subject of this opinion and order of court.[1]

Plaintiffs are successors-in-interest, through bankruptcy reorganization, to the assets and undischarged liabilities of Allegheny International Inc., and certain subsidiaries. Defendants are insurance companies which issued comprehensive general liability policies, primarily in the 1970s and 1980s, to Allegheny International, its subsidiary, or its predecessor in interest.

Plaintiffs' complaint identifies 11 sites where one or more of plaintiffs may be liable for cleanup and remediation expenses resulting from actual or threatened environmental contamination or pollution. The complaint alleges that plaintiffs or their predecessors have already spent in excess of $30 million as a result of claims involving the 11 sites and anticipate that they will spend substantial additional sums in the future.

Plaintiffs have requested defendants to provide coverage for claims involving environmental contamination and pollution at the 11 sites under dozens of primary

---

1. In the present opinion, I am including portions of the July 17, 1996 opinion that are relevant to the issues raised through defendants' preliminary objections to this amended complaint in law.

and excess CGL policies issued by defendants. Defendants have denied coverage.

The insurance policies which defendants issued to plaintiffs are standard policies developed and utilized by the insurance industry. The standard CGL policy provides coverage for damages arising out of an "occurrence" which is defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage that was neither expected nor intended from the standpoint of the insured."

Since 1970, this standard CGL policy has contained a pollution exclusion clause which states that the insurance does not apply "to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.* (emphasis added)

Defendants contend that this pollution exclusion precludes coverage for all damage from waste materials unless the waste materials were discharged through an abrupt and abbreviated accident.

In this case, the environmental contamination is the result of waste materials that plaintiffs intended to discharge into or upon land, the atmosphere or bodies of water. While the discharge was intended, plaintiffs allege that they did not anticipate that the discharge would result in environmental contamination. Plaintiffs recognize that at this time they cannot recover in this court by arguing that the plain and ordinary meaning of the words in the pollution exclusion clause permits

an interpretation which excludes coverage only in cases of intentional pollution—*i.e.,* where the property damage was either expected or intended by the insured.[2]

The Pennsylvania Superior Court has consistently ruled that this standard pollution exclusion bars coverage for "any unintentional release or dispersal of pollution that occurs gradually over time"; there is coverage only where a discharge is "both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." *O'Brien Energy Systems Inc. v. American Employers' Insurance Company,* 427 Pa. Super. 456, 465, 466, 629 A.2d 957, 962 (1993), quoting *Lower Paxton Township v. United States Fidelity and Guaranty Co.,* 383 Pa. Super. 558, 568, 557 A.2d 393, 398 (1989), *alloc. denied,* 523 Pa. 649, 567 A.2d 653 (1989); *Techalloy Company Inc. v. Reliance Insurance Co.,* 338 Pa. Super. 1, 487 A.2d 820 (1984), *alloc. denied,* 338 E.D. Allo. Dkt. 1985 (Pa. Oct. 31, 1985).

The opinion of Honorable Phyllis W. Beck in *Lower Paxton Township v. United States Fidelity and Guaranty Co., supra,* is the most comprehensive. The insurance policy in that case contained the standard pollution exclusion, and the insured sought insurance coverage for damages caused by the gradual, repeated release of pollutants. Judge Beck applied the general principle of insurance law that if a policy term is susceptible to two interpretations or subject to reasonable question, it shall be construed in favor of the insured. Thus,

---

2. Where the language of an insurance policy is ambiguous, the policy is to be construed in favor of the insured and against the insurer. But where the language of an insurance policy is clear and unambiguous, the court is required to give effect to that language. See *Madison Construction Co. v. Harleysville Mutual Insurance Co.,* 451 Pa. Super. 136, 142, 678 A.2d 802, 805 (1996), and cases cited therein.

the controlling issue was whether the pollution exclusion clause is ambiguous.

The insured argued that the language of this exclusion, if given its ordinary meaning, may be reasonably construed to exclude coverage only in cases of intentional pollution—*i.e.,* where the pollution is either expected or intended by the insured. The insurance company, on the other hand, argued that there is no ambiguity—the plain and ordinary meaning of "sudden and accidental" imposes a double requirement: the discharge must be both non-gradual and unexpected. The insured contended that this language on which the insurance company relied was not as clear as the insurance company suggested. The term "sudden" is not defined in the policy and the word itself has no clear, plain meaning. Furthermore, since the policy provides coverage for an occurrence which includes continuous and repeated exposure to conditions which result in bodily injury or property damage, the coverage provision is misleading unless the pollution exclusion is construed in a narrower fashion.

The Superior Court rejected these arguments of the insured. Judge Beck stated that the juxtaposition of the occurrence provision and the pollution exclusion does not create any confusion. The policy provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage for damages caused by a pollutant is limited to a discharge that is sudden and accidental. She also concluded that the everyday meaning of "sudden" contains a temporal element. The court's opinion said that:

"This additional element is the temporal meaning of sudden, *i.e.* abruptness or brevity. To define sudden as meaning only unexpected or unintended, and there-

fore as a mere restatement of accidental, would render the suddenness requirement mere surplusage." *Lower Paxton Township v. United States Fidelity and Guaranty Co., supra* at 577, 557 A.2d at 402.

As I previously stated, the pollution exclusion upon which defendants rely is a standard exclusion contained within the standard comprehensive general liability insurance policies utilized by the insurance industry. In most states, the approval of the state insurance regulatory body was a prerequisite for the inclusion of the pollution exclusion clause within the policy. Plaintiffs seek to avoid the *Lower Paxton Township* line of cases by arguing that the insurance industry interpreted the pollution exclusion clause in the manner that plaintiffs propose in order to obtain approval for the inclusion of the exclusion in CGL policies and that the insurance industry is bound by its interpretation.

According to plaintiffs' complaint, prior to 1966, the standard CGL policy covered liability "caused by accident." The term "accident" was undefined, leading some courts to interpret it as being limited to temporally sudden, unexpected, and identifiable events and other courts to interpret it as applying also to unintended and unexpected injuries or damages that resulted from gradual processes. The insurance industry responded to the uncertainty by establishing a task force to draft what eventually became the 1966 CGL policy language. The 1966 CGL policies substituted an "occurrence" approach for the "accident" approach; this new approach afforded coverage based on an occurrence which the CGL policy defined as an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage that was neither expected nor intended from the standpoint of the insured. (See this opinion, *supra,* at 47.)

The purpose of the 1966 language was to cover gradual damage or injury.

Approximately four years later, foreseeing pending increases in claims for environmentally related losses, the insurance industry drafted the qualified pollution exclusion that is the subject of this litigation, namely the pollution exclusion that excludes any bodily injury or property damage caused by pollution other than a discharge, dispersal, release, or escape that is "sudden and accidental."

Plaintiffs' complaint alleges that the insurance industry intended for this exclusion to be a mandatory addition to the standard CGL policy. In order to accomplish this result, the insurance industry was required to obtain the approval of the insurance regulatory authorities of the various states for the addition of this exclusion to the standard CGL policy. This required the insurance industry to explain the purpose and intended effect of the exclusion. The insurance industry submitted the same explanatory memorandum to each of the regulatory authorities. This memorandum included the following statement:

"Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The [proposed] exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident. . . . " Amended complaint in law at ¶46.

Plaintiffs aver that the insurance industry described the purpose of the exclusion in this fashion in order to persuade state regulatory bodies to approve the addition of the exclusion to the standard CGL policy with

no reduction in premiums and no change in the wording of the proposed exclusion.[3]

In May 1970, the insurance industry sought the Pennsylvania Insurance Department's approval of the qualified pollution exclusion pursuant to regulations of the Pennsylvania Insurance Department which require that any changes in policy forms or endorsements be approved by the insurance department. In connection with the submission of the proposed exclusion, the insurance industry submitted to the insurance department the explanation of the purpose and effect of the proposed exclusion that is quoted in this opinion at 51, *supra*. Plaintiffs allege that the industry represented that the proposed exclusion was merely a clarification of existing coverage, that no cutback in coverage was intended, and that coverage would continue for pollution claims caused by an "accident" which in Pennsylvania included long-term effects of gradual pollution so long as the damage was not expected or intended.

Plaintiffs' complaint also contains the following allegations: The Pennsylvania Insurance Department relied on these representations and understood that the proposed exclusion was only a clarification of existing coverage which would not result in a substantial reduction in coverage. Had the insurance department, prior to its approval of the exclusion, been told or understood that the proposed exclusion involved a major change or limitation of coverage, the actuarial division of the Pennsylvania Insurance Department would have re-

3. The description in plaintiffs' complaint of the history of the standard pollution exclusion clause is almost identical to the New Jersey Supreme Court's description in *Morton International Inc. v. General Accident Insurance Co. of America*, 629 A.2d 831, 847-55 (N.J. 1993); also see *Joy Technologies Inc. v. Liberty Mutual Insurance Company*, 421 S.E.2d 493 (W. Va. 1992).

viewed the exclusion to evaluate the necessity of a premium change and determine whether a rate reduction would be warranted. Relying on the information and explanations provided by the insurance industry, the Pennsylvania Insurance Department approved the use of the standard pollution exclusion in Pennsylvania effective November 11, 1970.

## COUNT I—BREACH OF DUTY TO DEFEND

## COUNT II—BREACH OF DUTY TO INDEMNIFY

Counts I and II are breach of contract claims. Plaintiffs allege that under the provisions of their insurance policies with defendants, defendants agreed to provide a defense and to provide coverage for property damage occurring from repeated exposure to the discharge of waste materials which, although not expected or intended to cause damage, did so over time. Plaintiffs seek to avoid the case law holding that the everyday meaning of the language of the pollution exclusion bars any claims based on the gradual release of pollution by arguing that the pollution exclusion should be construed by looking to the accepted meaning of the exclusion in the industry at the time the exclusion was initially included in the standard CGL policy. They then rely on the statement of the explanatory memorandum set forth at page 51 of this opinion that the insurance industry submitted to each regulatory authority which says that "[c]overage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident" and that only damages which are "expected or intended" are excluded by this pollution exclusion.

There is support for plaintiffs' position that a contract should be construed by considering the manner in which the terms are used within a particular industry. *See* Restatement (Second) of Contracts §202(3) (technical terms and words of art are given their technical meaning when used in a transaction within their technical field); section 220 (an agreement is interpreted in accordance with relevant usage); and section 222 (unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged gives meaning to their agreement). There is also support for plaintiffs' position that a court may be permitted to consider the regulatory history in construing the pollution exclusion under the Pennsylvania case law that permits extrinsic evidence to be introduced to show a latent ambiguity. *Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa. Super. 194, 204, 657 A.2d 17, 22 (1995); *Z & L Lumber Co. of Atlasburg v. Nordquist,* 348 Pa. Super. 580, 585-86, 502 A.2d 697, 700 (1995); *Kohn v. Kohn,* 242 Pa. Super. 435, 443, 364 A.2d 350, 354 (1976).[4]

Also see my discussion at pages 10-11 of my July 17, 1996 opinion in which I characterize plaintiffs' argument as follows: If a court construes the post-1970 CGL policies simply by looking at the language of the pollution exclusion, the court may conclude that the exclusion clearly and unambiguously excludes unintentional releases or dispersals of pollution that occurred gradually over time. But, if a court also considers

---

4. But also consider the case law which indicates that in construing an insurance policy, a court shall be guided entirely by the language of the policy and shall not give consideration to any extrinsic evidence concerning the meaning that any party gave to the policy. *Madison Construction Co. v. Harleysville Mutual Insurance Co., supra; Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 469 A.2d 563 (1983).

the regulatory history set forth in plaintiffs' complaint, the court should conclude that the language of the pollution exclusion is ambiguous; thus, the policy must be construed in favor of plaintiffs.

However, as I previously discussed, on several occasions the Pennsylvania Superior Court has rejected the argument that the pollution exclusion may be reasonably construed to exclude coverage only in cases where the damage was intended or expected. The court has said that any interpretation of the clause which defines "sudden" as meaning only unexpected or unintended is "blatantly unreasonable." *Lower Paxton Township v. United States Fidelity and Guaranty Co., supra* at 577, 557 A.2d at 402. Consequently, I should follow these decisions unless the court's opinions suggest that extrinsic evidence that was not presented may produce a different result.

Plaintiffs cite footnote 5 in *Lower Paxton Township v. United States Fidelity and Guaranty Co.,* which reads as follows:

"5. Amici curiae writing in support of the township have provided this court with lengthy argument and documentary materials concerning the drafting history and regulatory approval process of the exclusion when it was first proposed in the early 1970s. Amicus seek to convince us that the township's coverage promoting interpretation of the exclusion is correct because it was the insurers' own interpretation at the time they drafted it and was the interpretation relied upon by insurance regulators in approving it.

"We express no comment on these arguments. Having found the exclusion unambiguous on its face, we are bound to construe it in accordance with its plain meaning and may not refer to extrinsic evidence of the drafters' intent. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d

659 (1982); *Camp Joy Inc. v. Commonwealth,* 70 Pa. Commw. 142, 452 A.2d 891 (1982). We also note that the documentary materials are dehors the record, having been presented for the first time on appeal." *Id.* at 578 n.5, 557 A.2d at 402-403 n.5.

If this footnote had ended with the statement "We express no comment on these arguments," I would conclude that the Superior Court was inviting future litigants and state trial courts to explore this argument. However, the apparent purpose of the next sentence is to indicate that the argument will fail because of case law holding that a court may not refer to extrinsic evidence of the drafters' intent where the language of the clause is clear and complete.

For these reasons, I sustain defendants' preliminary objections in the nature of a demurrer to Counts I and II of plaintiffs' complaint.

## COUNT III—ESTOPPEL FROM DENYING INDEMNITY COVERAGE

Defendants Liberty Mutual and PMA refused to provide a defense to plaintiffs for claims raised in administrative proceedings and legal actions against plaintiffs at the Bally Site. Plaintiffs contend that these defendants breached their contractual obligations by their failure to provide a defense, so they are estopped from questioning the amount of the costs that plaintiffs incurred in providing a defense and in cleaning up the Bally Site in response to the underlying administrative and legal actions.

This count has merit only if I find that Liberty Mutual and PMA had a duty to provide a defense. For the reasons set forth in my discussion of Counts I and

II, these defendants were not required to provide a defense.

## COUNT VIII—REGULATORY ESTOPPEL

I am considering plaintiffs' regulatory estoppel claim before I address plaintiffs' fraud claims raised in Counts IV-VII because there is a close relationship between the regulatory estoppel and fraud claims, and the fraud claims cannot be adequately addressed without understanding the regulatory estoppel claim.

Plaintiffs claim that they are entitled to the coverage that the Pennsylvania Insurance Department believed that Pennsylvania's policyholders were obtaining on the basis of the representations of the insurance industry to the insurance department. They support this position with the following argument: Courts should not decide a coverage issue solely by considering the language of a standard insurance agreement. Standard insurance contracts are contracts of adhesion. The insured does not have any bargaining power and must adhere to the terms of a form contract which are not negotiable. *Ferguson v. Lakeland Mutual Insurance Company*, 408 Pa. Super. 332, 336, 596 A.2d 883, 885 (1991). In recognition of this fact, the legislature has created a regulatory process through which an insurance department protects the interests of policyholders. The purpose of the regulatory scheme is to create a balance between policyholders and insurance companies that would not be achieved if the insurance industry was not regulated. This balance would be undermined if policyholders did not receive the protections which the insurance companies advised the regulatory agencies that they were providing. Thus, policyholders are entitled to the protections which the insurance department believed that

it was providing to policyholders when it approved the use of the standard pollution exclusion.

The New Jersey Supreme Court's ruling in *Morton International Inc. v. General Accident Insurance Co. of America, supra,* supports plaintiffs' position. The court concluded that the requirement that the discharge be "sudden" possesses a temporal element generally connoting an event that begins abruptly and without prior notice or warning. Thus, if the coverage issue is governed by the language in the policy, coverage would not include property damage from continuous or repeated exposure to conditions. However, the court held that notwithstanding its literal terms, the standard pollution exclusion clause should be construed in a manner consistent with the reasonable expectations of the New Jersey insurance regulatory authority.

The court looked to the reasonable expectations of the insurance regulatory authorities rather than the language of the pollution exclusion because the interests of the policyholders are protected through the regulatory authorities rather than through any bargaining between the insurance company and the policyholder over the terms of the policy. Thus, the reasonable expectations of the insurance regulatory authorities should be imputed to the policyholders to whom the CGL policies with standard pollution exclusion clauses were issued after the clause had been approved on the basis of the explanatory memorandum. Consequently, the court interpreted the clause to preclude coverage only in cases in which the insured intentionally discharged a known pollutant.

In reaching this result, the New Jersey Supreme Court relied on the statements in the explanatory memorandum to the state regulatory bodies set forth in this opinion at 51, *supra.* The court said that the first sentence of

the explanation ("Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence") was untrue because the 1966 version of the CGL policy covered property damage from gradual pollution. The court found the second sentence ("The above exclusion clarifies this situation so as to avoid any question of intent") to be "even more misleading than the first." *Morton International Inc. v. General Accident Insurance Co. of America, supra,* 629 A.2d at 852. The court said that:

"To describe a reduction in coverage of that magnitude as a "clarification" not only is misleading, but comes perilously close to deception. Moreover, had the industry acknowledged the true scope of the proposed reduction in coverage, regulators would have been obligated to consider imposing a correlative reduction in rates." *Id.* at 853.

Furthermore, the court found that the explanatory memorandum's "lack of clarity was deliberate." *Id.*

No Pennsylvania appellate court cases have addressed a regulatory estoppel claim.[5] Most other jurisdictions have rejected claims of insureds based on the insurance

---

5. According to plaintiffs, the Pennsylvania Supreme Court granted allocatur in *Central Dauphin School District v. Pennsylvania Manufacturer's Ass'n. Ins. Co.,* 537 Pa. 628, 642 A.2d 482 (1994), to review a ruling of the Pennsylvania Superior Court that had affirmed a ruling by the Common Pleas Court of Dauphin County (16 D.&C.4th 289 (1992)) dismissing a suit on the ground that the 1970 pollution exclusion excludes coverage where the contamination is gradual. This case was settled before a decision by the Supreme Court. Plaintiffs state that the issues on appeal included whether insurers may enforce a policy exclusion in a manner different from what was represented to gain approval for the exclusion's use.

industry's 1970s submissions to the state regulatory bodies. See, *e.g., Charter Oil Co. v. American Employers' Insurance Co.,* 69 F.3d 1160 (D.C. Cir. 1995); *Federated Mutual Insurance Co. v. Botkin Grain Co.,* 64 F.2d 537, 541-42 (10th Cir. 1995); *Cincinnati Insurance Co. v. Flanders Electric Motor Service Inc.,* 40 F.3d 146, 153 (7th Cir. 1994); *Smith v. Hughes Aircraft Co.,* 10 F.3d 1448, 1453 (9th Cir. 1993); *Snydergeneral Corp. v. Great American Insurance Co.,* 928 F. Supp. 674, 681-83 (N.D. Tex. 1996); *Montana Refining Co. v. National Union Fire Insurance Co. of Pittsburgh,* 918 F. Supp. 1395, 1402-1403 n.8 (D. Nev. 1996); but see *Joy Technologies Inc. v. Liberty Mutual Insurance Company, supra; Cessna Aircraft Co. v. Hartford Accident & Indemnity Co.,* 900 F. Supp. 1489, 1510 (D. Kan. 1995); *Anderson v. Minnesota Insurance Guaranty Assoc.,* 534 N.W.2d 706 (Minn. 1995).

My primary difficulty with plaintiffs' regulatory estoppel claim is that it rests on the assumption that the regulatory bodies of the various states did not function as regulators. The insurance commissioners of the various states and their staffs would have known that some industries and businesses which were obtaining insurance coverage through standard CGL policies were releasing waste materials into and upon the land, the atmosphere, and bodies of water. The discharge of the waste materials was intentional and was occurring over long periods of time. While the discharge was intentional, the industries and businesses might reasonably have believed that the discharge was harmless. However, there was always a risk of unintended environmental contamination resulting from this intended and gradual discharge of waste materials. In this setting, the regulatory bodies were being asked to approve a pollution

exclusion clause that would deny coverage for any property damage arising out of a discharge of a pollutant unless the discharge was "sudden and accidental."

The insurance industry submitted, along with the language of the proposed exclusion, the memorandum which included what purported to be the insurance industry's explanation of the proposed exclusion. In considering plaintiffs' regulatory estoppel claim, I must decide how this memorandum would have influenced the decisions of the regulatory bodies.

One alternative is that the regulatory bodies never bothered to review the proposed language, but simply took the insurance industry's word as to what the exclusion meant. I assume that this did not occur.

The other possibility is that the members of the regulatory bodies and their staffs read and studied the language of the proposed exclusion. Plaintiffs' regulatory estoppel argument requires that I find that after reading the pollution exclusion, the members of the regulatory bodies and their staffs looked to the insurance industry's explanation of the proposed pollution exclusion to determine the scope of the exclusion. However, it is far more reasonable to assume that a regulatory body would attach its own meaning to the language of a proposed exclusion and that it would, in fact, be suspicious of an industry explanation which appeared to be somewhat inconsistent with the proposed language.

Presently, at least half of the courts which have considered the pollution exclusion have concluded that the terms "sudden" and "accidental" are clear and unambiguous: the discharge must be both non-gradual and unexpected. Courts that have reached the opposite result have concluded that the language is ambiguous; I know of no court which has stated that the language

of the pollution exclusion clearly and unambiguously does not include gradual and expected discharges where the environmental contamination was not intended or expected. Since the regulatory bodies were looking at this same language, I must assume that they knew that this proposed language could (or would) be construed to exclude coverage for any damages from a gradual discharge of waste material.

Regulatory bodies know that courts construe insurance policies by considering the language of the policies. It is the job of a regulatory body to ensure that the language of an exclusion reflects the scope of any exclusion that the regulatory body intends to permit. With respect to the pollution exclusion, the proposed language did not involve technical terms or special coverage matters that were beyond the expertise of the regulatory bodies. Consequently, the regulatory bodies intended to authorize a pollution exclusion that could be construed in the courts in accordance with Judge Beck's construction in *Lower Paxton Township v. United States Fidelity and Guaranty Co.*

Plaintiffs contend that the Pennsylvania Insurance Department could not have intended to approve the pollution exclusion as presently construed by the insurance industry because if coverage was going to be significantly narrowed, premiums would have been adjusted. However, possibly, the premiums based on the coverage provided for in the 1966 CGL policy assumed very minimal risk for pollution damage; thus, the 1970 pollution exclusion was eliminating potential future claims that had not been included in the premium calculation. Possibly, the insurance department concluded that the purpose of the standard CGL policy had never been to provide protection to insureds who were intentionally discharging waste materials into the envi-

ronment; thus, the proposed pollution exclusion was consistent with the other provisions of the insurance policy that provide protection for damages from events beyond the control of the insured. Each of these explanations is at least as likely as the explanation that the Pennsylvania Insurance Department had no idea that through the approval of the language of this pollution exclusion it might now be providing coverage only when the discharge was abrupt and accidental.[6]

Plaintiffs raise a second argument, somewhat inconsistent with the prior argument, to support a claim of regulatory estoppel. They contend that the 1966 CGL policies provided insurance protection for any environmental change that was not intended or expected. Thus, the purpose of the 1970 exclusion was to substantially reduce the coverage provided under the 1966 CGL policies by providing protection only where the discharge is abrupt and accidental. However, the insurance regulators and their staffs relied on statements of the insurance industry that the 1970 pollution exclusion was not changing in any significant way the coverage provided by the 1966 CGL policies for property damage caused by pollution. This argument is based on the statement in the memorandum which the insurance industry provided to the insurance regulators that coverage for pollution "is not provided in most cases under present policies because the damages can be said to be expected or intended and thus excluded by the definition of occurrence."

------

6. The issue of whether an estoppel results from the facts which a plaintiff has alleged is a judicial determination. *Northcraft v. Edward C. Michener Associates Inc.,* 319 Pa. Super. 432, 444, 466 A.2d 620, 627 (1983).

However, the insurance agencies and their staffs would have known of the scope of the coverage under the 1966 CGL policies. In Pennsylvania, for example, on March 20, 1970 in *Lancaster Area Refuse Authority v. Transamerica Insurance Co.*, 437 Pa. 493, 263 A.2d 368 (1970), the Pennsylvania Supreme Court reversed a holding of the Pennsylvania Superior Court that had denied coverage for pollution claims of two property owners whose wells were polluted as a result of a landfill operated by the insured.[7] The Pennsylvania Supreme Court, adopting the dissenting opinion of the Superior Court in *Lancaster Area Refuse Authority v. Transamerica Insurance Co.*, 214 Pa. Super. 80, 251 A.2d 739 (1969), held that there was coverage because the insured had not intended to damage the wells of its neighbors.

The initial request of the insurance industry to the Pennsylvania Department of Insurance for permission to include the pollution exclusion was made in May 1970. The request was approved in November 1970. Consequently, I assume that the Pennsylvania Insurance Department would have been aware of this ruling of the Pennsylvania Supreme Court and its potential effect on coverage claims based on the 1966 CGL policies at the time it was deciding whether to approve the pollution exclusion.

The recognition of a regulatory estoppel doctrine would raise issues of proof that are not manageable. Plaintiffs are requesting that the Pennsylvania courts determine the reasons that the Pennsylvania Insurance Department approved a pollution exclusion in November 1970. Courts should not be creating a body of law that provides for courts to make such determinations for several reasons.

---

7. This lawsuit involved a pre-1966 CGL policy.

First, the passage of time creates numerous obstacles.

Second, but even without the passage of time, it is difficult to determine the actual reasons for a decision of a governmental body.

Third, the insurance department is not a branch of the judiciary; it is an administrative body created by the legislature that can exercise only those powers conferred on it by the legislature.[8] Under the separation of powers doctrine, the law places severe restrictions on the ability of one branch of government to explore the reasons why decisions were made by another branch of government. While courts may consider motives and purposes by looking at the actions that were taken by another branch of government, courts seldom require the decision-makers of another branch of government to provide explanations for their actions.

Finally, a regulatory estoppel doctrine will usually involve insurance policies written over several years. In this case, for example, the policies upon which plaintiffs sue were written into the 1990s. At some point, the insurance department would have been aware of the interpretation that the insurance industry was placing on the pollution exclusion and of the court rulings construing this exclusion. Thus, it would have been setting premiums on the basis of potential claims and payouts under CGL policies containing the 1970 pollution exclusion clauses as construed by the insurance industry and the courts. Furthermore, the insurance commissioner has the authority, with cause, to withdraw approval of forms which had been approved previously *(Physicians Mutual Insurance Company v. Denenberg,* 15 Pa. Commw. 509, 327 A.2d 415 (1974)); the com-

---

8. See the Insurance Department Act of 1921, as amended, Act of May 17, 1921, P.L. 789, 40 P.S. §1 et seq.

missioner has never withdrawn the pollution exclusion. These factors suggest that a claim of regulatory estoppel based on a 1970 fraud does not have a life that extends indefinitely. If the life of the claim does not extend indefinitely, it is not clear when the 1970 exclusion should no longer receive the interpretation which plaintiffs now propose.

In summary, if the insurance commissioner, the attorney general, or some other governmental official seeks court intervention on the ground that the Pennsylvania Department of Insurance has been duped by the insurance industry, court intervention may be feasible. However, where an insured claims that the insurance department has been duped, courts are not in a position to determine if this is so or to impose the appropriate remedy for any such wrongdoing.

For these reasons, I am granting defendants' preliminary objections in the nature of a demurrer to Count VIII.

## COUNTS IV-VII—FRAUD AND MISREPRESENTATION CLAIMS

In these fraud and misrepresentation counts, plaintiffs do not claim that they purchased insurance in reliance on any representations that were made by the insurance industry or the insurance companies to plaintiffs or to the Pennsylvania Insurance Department. Neither do they claim that they had any particular understanding as to the scope of the pollution exclusion clause at the time they obtained insurance.

Plaintiffs' fraud claims are based on the representations that the insurance industry made to the Pennsylvania Insurance Department. Plaintiffs contend that the insurance industry representatives were acting as

agents of defendants and that policyholders whom the regulatory process is intended to protect may stand in the shoes of the Pennsylvania Insurance Department where there has been a fraud against the department that harmed the policyholders. I need not address this contention because the Pennsylvania Insurance Department could not maintain a fraudulent misrepresentation claim against the insurance industry.

The elements of a fraudulent misrepresentation claim ate (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) a justifiable reliance by the recipient on the misrepresentation, and (5) damage to the recipient as a proximate result. *Krause v. Great Lakes Holding Inc.,* 387 Pa. Super. 56, 67, 563 A.2d 1182, 1187 (1989), *alloc. denied,* 524 Pa. 629, 574 A.2d 70 (1990); *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa. Super. 90, 108, 464 A.2d 1243, 1252 (1983).

In my discussion of plaintiffs' regulatory estoppel claim, I rejected plaintiffs' contention that the insurance department approved the pollution exclusion clause in reliance on the representations of the insurance industry concerning the manner in which the clause would operate and its impact on coverage provided under the 1966 CGL policies. For these reasons, I find that plaintiffs may not establish the fourth element of a fraudulent misrepresentation claim: a justifiable reliance by the recipient on the misrepresentation.

The Pennsylvania Insurance Department, as a regulatory body, was in a position to know what property damage pollution claims were likely to be covered and likely not to be covered under the 1966 CGL policies. Its staff and decision-makers would also be expected to read the language of the proposed exclusion and

to make an independent determination as to its meaning and, consequently, as to its effect on the coverage provided through the 1966 policies. This is not a situation in which the Pennsylvania Insurance Department needed any information from the insurance industry to make a decision as to the potential impact of the proposed pollution exclusion. Consequently, there could be no justifiable reliance by the recipient on the misrepresentation.

Also, to the extent that the misrepresentation claim is based on the insurance industry's breach of a promise to construe the pollution exclusion clause in a particular manner in the future, plaintiffs face the case law which holds that a fraudulent representation claim may not be based on a promise to do something in the future. *Krause v. Great Lakes Holdings Inc., supra* at 67, 563 A.2d at 1187.

For these reasons, I find that Counts IV-VII of plaintiffs' amended complaint fail to state a cause of action.

## COUNT IX—DOCTRINE OF REASONABLE EXPECTATIONS

This count is also based on the premise that the insurance contracts should be enforced in accordance with the objectively reasonable expectations of the insurance regulatory authorities. Under this count, plaintiffs seek to extend the doctrine that an insurance contract shall be enforced in accordance with the objectively reasonable expectations of the insured to include the objectively reasonable expectations of insurance regulatory authorities. This count fails for the same reasons that I rejected plaintiffs' regulatory estoppel claim. I assume that the expectation of the Pennsylvania In-

surance Department was that the proposed pollution exclusion would be construed by considering the language of the exclusion. If the language of the exclusion was inconsistent with the insurance industry's description of the manner in which the exclusion would operate and its impact on existing coverage, the Pennsylvania Insurance Department would have reasonably expected that the language of the exclusion rather than the insurance industry's explanation would control.

## COUNT X—QUASI-ESTOPPEL

This count is also based on allegations that the representations, explanations and information which the insurance industry furnished the regulatory authorities regarding the impact and meaning of the proposed pollution exclusion clause was material to the regulators' decision to approve the pollution exclusions. This count is based on the legal doctrine that after accepting the benefits, a party cannot maintain a position inconsistent with the position taken to secure these benefits. For the reasons that I previously discussed, the regulatory authorities were in a position to independently assess the manner in which the proposed exclusion might be construed and the impact of possible constructions of the proposed exclusion on existing coverage. Thus, the insurance industry's representations were not material.[9]

For these reasons, I enter the following order of court:

---

9. The essential elements of an equitable estoppel are inducement and justifiable reliance on the inducement. *Zitelli v. Dermatology Education and Research Foundation,* 534 Pa. 360, 370, 633 A.2d 134, 139-40 (1993); *Novelty Knitting Mills Inc. v. Siskind,* 500 Pa. 432, 457 A.2d 502 (1983); *Paul v. Lankenau Hosipital,* 375 Pa. Super. 1, 8, 543 A.2d 1148, 1152-53 (1988); *rev'd,* 524 Pa. 90, 569 A.2d 346 (1990).

## ORDER

On April 2, 1997, upon consideration of defendants' preliminary objections in the nature of a demurrer to plaintiffs' amended complaint at law, it is hereby ordered that these preliminary objections are sustained as to each count within the amended complaint at law and plaintiffs' complaint is dismissed with prejudice.