# Foley, Exr., et al., Appellants, v. Wasserman et al.

Argued December 5, 1934.  Reargued April 29, 1935. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*George E. Beechwood* and *William J. Conlen,* of *Conlen, LaBrum & Beechwood,* with them *Mark E. Lefever,* for appellants.

*Alexander Conn,* for appellees.

OPINION BY MR. JUSTICE DREW, June 29, 1935:

This action in trespass was brought against defendants, a firm of stockbrokers doing business in the City of Philadelphia, by Thomas J. Foley, one of their customers. Foley died before the trial, and his personal representatives were substituted as plaintiffs. The claim is for (1) the alleged balance due decedent upon the closing out of his marginal trading account, and (2) damages for alleged wrongful sales and rehypothecations of securities owned by him and carried in said account. At the conclusion of plaintiffs' evidence a compulsory nonsuit was entered, and from the refusal of the court in banc to take it off plaintiffs appealed.

Viewed in the light most favorable to plaintiffs, as it must be, the evidence discloses the following facts: Decedent, a man of extensive business experience, became acquainted with one Edward McGrath in another brokerage office. Subsequently McGrath persuaded decedent to transfer his market activities to defendants' house, telling decedent that if he did so he (McGrath) could get a position with them. Sometime in 1928, decedent opened an account with defendants and thereafter actively bought and sold securities through them. His orders to buy and sell were generally placed through Mc-

Grath, who had become a customers' man for defendants. Decedent also opened accounts in the names of several relatives and traded extensively in them. In each instance he executed a general guaranty by which he promised to pay any debit balance that might become due. On January 21, 1929, he signed a similar instrument guaranteeing to defendants the personal account of Edward McGrath, carried in the name of his son, Joseph F. McGrath. This account was heavily traded in, and was finally closed out in November, 1929, with a loss of $16,001.08, which was then charged to decedent's account. Shortly before the McGrath account was closed out, Edward McGrath called decedent over the telephone, told him that his (Foley's) account was undermargined, and procured his consent to the sale of certain shares of United Gas Improvement Company stock to protect the account. An amount greatly in excess of that authorized was sold. In May, 1930, decedent closed his accounts with defendants. As originally brought by decedent, this action was for the recovery of damages for the alleged wrongful sale of U. G. I. stock and for the balance of $16,001.08, representing the amount charged to his account from the McGrath account, his claim to this amount being based upon a contention that he was not liable on the McGrath guaranty because it was procured by fraudulent misrepresentations on McGrath's part as to the nature of its contents. After decedent's death, his personal representatives, upon learning of the manner in which defendants had carried his securities, filed an amended statement of claim seeking in addition damages for alleged wrongful rehypothecation of his securities, including the U. G. I. shares, as to which decedent had claimed damages for a wrongful sale.

In support of their contention that decedent was not liable on the McGrath guaranty plaintiffs introduced the deposition of decedent himself, taken during his last illness for use in the cause. In this deposition decedent stated that he could neither read nor write, except that

he could read and write his name; that McGrath approached him with the request that he guarantee his purchase of one hundred shares of Sinclair Oil; that he consented to do this; that McGrath then brought to him the instrument in question, asking that he sign it and saying that it was a guaranty covering one hundred shares of Sinclair Oil; and that, relying on this representation, he signed the paper. He further stated that McGrath told him that it was just "a form," that it was "all right," and that he would "fix it." Decedent further testified: "I gave him the liberty to buy one hundred and no more, and I told him to not buy no more shares of stock, and not to sell it until he acquainted me." It is urged that this evidence is sufficient to show fraudulent misrepresentations as to the contents of the guaranty. We cannot agree with this contention. It is well settled that in order to set aside an instrument on the ground of fraudulent misrepresentations, the evidence relied on to establish the same must be clear, precise and indubitable: P. R. R. Co. v. Shay, 82 Pa. 198; Ralston v. P. R. T. Co. (No. 1), 267 Pa. 257; Horsey v. Ciaroro, 280 Pa. 513; Keys v. Hanscom, 288 Pa. 389. As we said in Broida v. Travelers Ins. Co., 316 Pa. 444, in order to meet this standard the evidence must be "so clear, direct, weighty and convincing" as to lead to "a clear conviction, without hesitancy, of the truth of the precise facts in issue." The evidence here falls far short of measuring up to that standard. Decedent's testimony as to the guaranty was evasive and contradictory. Although he testified that McGrath told him it covered only one hundred shares, his warning to McGrath not to buy any additional shares is strongly indicative that he understood the guaranty to be general and unlimited, and relied upon McGrath's promise not to exercise it beyond the single transaction agreed upon. Furthermore, in view of decedent's business experience, his testimony that he relied on McGrath's representations is not convincing. A careful review of the testimony has satisfied us that

it fails to meet the required standard. The court below did not err, therefore, in refusing to submit this question to the jury.

As to the alleged wrongful rehypothecations, the testimony shows that decedent's securities were, upon purchase, immediately repledged with the New York brokers through whom they were purchased, to secure defendants' general loans, the amount of which was at all times greatly in excess of decedent's indebtedness to defendants. On the evidence as it appears in this record, the New York brokers were not bound to release the stock purchased for decedent upon the payment to them of the amount of his indebtedness to defendants, and the latter did not retain in their possession or under their control securities of like kind and amount for delivery to decedent upon demand. That rehypothecation under such circumstances amounted to a conversion cannot successfully be denied: Sproul v. Sloan, 241 Pa. 284; Darr v. Fidelity Title & Trust Co., 243 Pa. 591; Sterling's Est., 254 Pa. 155; Otis v. Medoff, 311 Pa. 62. It is claimed, however, that since the evidence shows that the value of the securities steadily declined thereafter no damages can be recovered, under the Act of April 10, 1929, P. L. 476. That act provides as follows: "In any proceeding hereafter instituted in any court of this Commonwealth, in which damages are claimed for the conversion of stocks, bonds, or other like property of fluctuating value, the damages shall be limited to the difference between the proceeds of the conversion, or that portion thereof duly paid or credited to the owner, and such higher value as the property may have reached within a reasonable time after he had notice of the conversion. Where the facts are not in dispute, this period shall be fixed by the court as a matter of law." The court below was of the opinion that there were no damages where the highest value reached within a reasonable time after notice of conversion was less than the value at the time of conversion. An examination of the cases

in the light of which the statute was enacted will, we think, show that this conclusion is erroneous.

Ordinarily the measure of damages for conversion is the value of the property at the time of conversion. From an early date it has been held, however, that if the property is of fluctuating value the damages are not so limited. In the older cases it was stated that in the case of conversion of such property the owner was entitled to the highest value between the time of conversion and the time of trial: Bank of Montgomery v. Reese, 26 Pa. 143; Learock v. Paxson, 208 Pa. 602; Berberich's Est., 264 Pa. 437. But this measure of damages was an enlargement of the general measure, whereby the value at the time of conversion may be recovered, and was in no sense a limitation upon it. The reason stated for it in the cases was that in the case of fluctuating property the ordinary measure of damages would be inadequate. The "highest value between the time of conversion and the time of trial" obviously includes the value at the date of conversion, and the rule never purported to reduce the damages below that value.

In Gervis v. Kay, 294 Pa. 518, we held that where the conversion consisted of a sale of the customer's stock by the broker under an honest misunderstanding of the customer's instructions the damages should be fixed at the difference between the sale price and the highest market price "during the interval between the time of its conversion and a time, after defendant's refusal or neglect promptly to replace the shares, when plaintiff had a fair opportunity, under the attending circumstances, to go into the market and acquire a like number of shares of the same stock." It is apparent that in stating this rule we did not intend to preclude in any instance the recovery of the value at the time of conversion. Our sole purpose was to reduce the time in which an increased value based on market fluctuations would be allowed. The effect of that decision was to prevent speculation on the customer's part by confining his recovery to the highest

market value between the date of conversion and the expiration of a reasonable time after notice thereof. No longer was the customer permitted to delay his suit for the purpose of charging the broker with the highest value the shares might reach in the period between the expiration of a reasonable time after notice and the date of trial.

In announcing the rule in the Gervis case we purported to follow the doctrine of Baker v. Drake, 53 N. Y. 211. In the application of that doctrine the New York courts have never held that the value at the time of conversion could not be recovered. It was stated in McIntyre v. Whitney, 139 App. Div. 557, affirmed 201 N. Y. 526: "It may confidently be asserted that the court of appeals have never decided or suggested that one guilty of conversion could profit by the decline in the market value of the thing converted between the time of conversion and the discovery of it by the party injured. The general rule of damage, of course, is the value of the thing converted at the time and place of the conversion, together with interest thereon from the time of conversion, and that rule should be adopted, in the absence of special circumstances, whereby it will not afford complete indemnity to the injured party." See Taussig v. Hart, 58 N. Y. 425; In re Salmon Weed & Co., 53 Fed. (2d) 335.

Gervis v. Kay was not, however, a complete repudiation of our earlier rule, for we there stated: "It is unnecessary, for purposes of the present case, to determine how generally the New York Rule should be declared applicable in this State. The point we now decide is that the principle of that rule is applicable . . . to a case where the broker, in making the sale, acted on an honest belief that he was carrying out the instructions of his customer; for the present is not a case where the stock in controversy was sold, in disregard of the rights of the real owner, to protect interests of the broker himself or in deliberate breach of trust. The question of how far,

or whether or not, the highest-price-to-date-of-trial rule should be modified in the latter class of cases is not now before us for decision."

Four months after that case was decided the legislature passed the Act of 1929, supra. It will be noted that the language of the act is that damages "shall be limited to the difference between the proceeds of the conversion . . . and such higher value as the property may have reached within a reasonable time after . . . notice of the conversion." From this it is apparent that the act simply extends the application of the measure of damages followed in Gervis v. Kay to all types of conversion of fluctuating property, whether innocent or wilful. Its purpose is to terminate the "highest-value" period at the expiration of a reasonable time after notice of the conversion, instead of allowing it to continue down to the date of trial, as was permitted under the old rule. The act does not, as defendants contend and as the court below held, confine the owner to the highest value between *notice* of the conversion and the expiration of a reasonable time thereafter. On the contrary, it clearly allows the recovery of the highest value between the *date* of the conversion and a reasonable time after notice thereof. This of course in no way prevents the recovery of the value at the date of conversion. The act is simply a limitation upon the recovery of damages in excess of that value.

It is urged, however, that plaintiffs are not entitled to recover substantial damages, in view of the fact that decedent's shares, or shares of like description, were later either delivered to him or sold at his request and the proceeds credited to his account. But the market values at that time were materially lower, and decedent was entirely ignorant of the wrongdoing on defendants' part. The conversion was complete at the time of the wrongful rehypothecation, and defendants' liability for the then values became fixed at that time. If the return of the securities or their sale for decedent's account were held

to bar the recovery of substantial damages, the broker could, as is pointed out in In re Salmon Weed & Co., supra, at page 339, "go merrily on in fair weather using his customers' stocks as capital in his business, whereas when storms arise such unlawful repledges are certain to cause losses to [customers] who have given no authority to repledge their stocks beyond the amounts of their own indebtedness." The acceptance of defendants' contention would encourage speculation by brokers at the risk of their customers: see Taussig v. Hart, supra. Defendants are of course entitled to be credited with the value of the securities returned as of the time of return and with the proceeds of sales credited to decedent's account. They cannot, however, set up the return of securities or the crediting of proceeds from sales as a bar to the action.

With regard to the alleged wrongful sales of U. G. I. shares it may be noted that in each instance the sales were at the market value and the full proceeds credited to decedent's account. It is clear that there would be no substantial damages as to these *sales* unless there were proof of higher market value after the sales, and there was no such proof. However, there was evidence that these shares had previously been rehypothecated and thereby converted and that the value at the time of rehypothecation was greater than that at the time of sale. Plaintiffs were therefore entitled to recover the difference between these values. The amended statement of claim, which sets up a conversion by rehypothecation of these shares as well as by wrongful sale, clearly supports such recovery.

Since plaintiffs' evidence was sufficient to establish a cause of action for substantial damages, the court below erred in entering a nonsuit, and the judgment must be reversed.

Judgment reversed and a procedendo awarded.