**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0794n.06
Filed: November 13, 2007

**No. 07-5060**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MUELLER COPPER TUBE PRODUCTS, INC.,

     **Plaintiff-Appellant,**

v.

PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY,

     **Defendant-Appellee.**

_____/

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE**

**BEFORE:**    KEITH and CLAY, Circuit Judges; and STEEH, District Judge.[*]

     **CLAY, Circuit Judge.**  Plaintiff Mueller Copper Tube Products, Inc. ("Mueller") appeals from a district court decision granting summary judgment in favor of Defendant Pennsylvania Manufacturers' Association Insurance Company ("PMA"). Plaintiff alleges, in this diversity suit brought under Pennsylvania law, that Defendant breached its contractual duties to defend Mueller and provide coverage under several insurance policies. Additionally, Plaintiff claims that this alleged breach occurred in violation of Pennsylvania's bad faith insurer statute, 42 Pa.C.S.A. § 8371.

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

Because Plaintiff's claims do not fall within the scope of the insurance policies at issue in this case,

we **AFFIRM** the district court's decision granting summary judgment in favor of Defendant.

## STATEMENT OF FACTS

**A.      The Underlying Lawsuit**

In 1999, Plaintiff Mueller was named as a defendant in the underlying lawsuit,[1] an action

brought under the Comprehensive Environmental Response Compensation and Liability Act of 1980

("CERCLA"), 42 U.S.C. § 9601, *et seq* (2000), claiming that Plaintiff contributed to the

contamination of two Superfund sites in eastern Arkansas.  The suit alleged that a company known

as Gurley Refining collected used oil from numerous facilities in the greater Memphis, Tennessee

area, including Halstead Industries, Inc. ("Halstead").  Halstead is Plaintiff's corporate predecessor.

These "sludges and filter material[s]" were then deposited in the two Superfund sites, known as the

"South 8th Street" site and the "Gurley Pit" site.  (J.A. 150.)

The underlying lawsuit alleges that, as contributors to the hazardous substances at these two

sites, Plaintiff is liable for any "releases" of those substances into the environment under CERCLA

§§ 107 and 113.  (J.A. 153.)  After incurring legal fees defending against these claims, Plaintiff

ultimately resolved the underlying lawsuit by settlement.

**B.      The Insurance Policies**

Plaintiff alleges that it was covered by comprehensive general liability insurance policies

issued by Defendant from March 31, 1967 until March 31, 1978.  While the existence and terms of

---

[1]The term "underlying lawsuit" refers to *Signature Combs, Inc., et al. v. United States of America, et al.*; Case No. 98-2968 (W.D. Tenn.).

the policies from 1967 until 1972 is disputed, the record contains copies of the policies in effect from March 31, 1972 until their termination in 1978. Under the 1972-78 policies, Defendant agreed to pay for damages to property, limited to $100,000 per year and per "occurrence."[2] (J.A. 171.) Additionally, each policy provides that Defendant "shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damaged, even if any of the allegations of the suit are groundless, false, or fraudulent." (*Id.*)

The policies are limited, however, by a "contamination or pollution exclusion," which states as follows:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(J.A. 378.) (emphasis added). While no copies of the policies from 1967 until March 31, 1972 exist in the record, Plaintiff alleges that they do not contain the pollution exclusion.

In July 30, 1999, Plaintiff sent Defendant a letter notifying it of the underlying lawsuit and requesting coverage under 1967-77 policies. Defendant responded on October 12, 1999 with a letter acknowledging receipt of the July letter, informing Plaintiff that it was only able to locate the March 31, 1972-1978 policies, and offering to review any copies of the earlier policies which Plaintiff could provide. Defendant did not follow up its October letter with a decision to accept or deny Plaintiff's claim. On September 21, 2001, Plaintiff informed Defendant in a letter that the underlying lawsuit

---

[2]The term "occurrence" is not defined by the policies. (J.A. 171)

3

was entering mediation, and requesting that Defendant send a representative to attend this mediation. Defendant did not send a representative. Plaintiff filed this suit on August 5, 2004, alleging that Defendant breached its contractual agreement to provide coverage, including legal defense, for Plaintiff's losses in the underlying lawsuit, and that Defendant acted in bad faith by denying coverage.

## DISCUSSION

### *Choice of Law*

As this diversity suit was originally filed in a federal district court sitting in Tennessee, this Court must apply Tennessee's choice of law rules in resolving this case. *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). In contract disputes, Tennessee law provides that the contract will be governed by the law of the state where it was enacted. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). As the insurance policies in this case were issued in Pennsylvania, both parties agree that Pennsylvania law governs.

### *Standard of Review*

This Court reviews a district court's grant of summary judgment *de novo*. *Spirit Airlines v. Northwest Airlines, Inc.*, 431 F.3d 917, 930 (6th Cir. 2006). Summary judgment will be affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If, on the other hand, "a reasonable

jury could return a verdict for the non-moving party," summary judgment for the moving party is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, this court draws all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Despite the inferences drawn in the non-moving party's favor, the party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts," *id.* at 586, and may not contest a properly supported summary judgment motion merely by relying on the pleadings. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 324 (1986). Rather, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quoting Fed.R.Civ.P.56(e)). This Court has no obligation to "wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 110-11 (6th Cir. 1989).

I. **PMA'S OBLIGATION TO DEFEND MUELLER IN THE UNDERLYING LAWSUIT**

Under Pennsylvania law, an insurer's obligation to defend "arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy**.**" *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 322 (Pa. 1963) (emphasis in original). "Consequently, there may be an obligation to defend" even though there is "no obligation to indemnify." *Id.* In order to determine whether an insurer has a duty to defend, a court must first determine the scope of the applicable insurance policy. *See Erie Ins. Exchange v. Muff*, 851 A.2d 919, 926 (Pa. Super. Ct. 2004) ("The duty to defend is limited to only those claims covered by the policy."). Only after

the scope of the policy has been determined may a court consider whether the factual allegations of a complaint "comprehend an injury which is actually or potentially within the scope of the policy." *Id.*

### A.      The Pre-March 31, 1972 Policies

Plaintiff argues that it purchased policies from Defendant covering the period from March 31, 1967 until March 31, 1972 which did not include the pollution exclusion.  Neither party, however, has produced copies of these policies.  Under Pennsylvania law, a claimant seeking to recover under a lost instrument "is required to prove its former existence, execution, delivery, *contents*, that he is the owner thereof at the time of trial, and that the instrument is lost." *In re Greggerson's Estate*, 25 A.2d 711, 713 (Pa. 1942) (emphasis added).  Furthermore, this burden must be established by clear and convincing evidence. *Id.*  In Pennsylvania, clear and convincing evidence "must be so clear, direct, weighty, and convincing as to lead to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Foley v. Wasserman*, 179 A. 595, 597 (1935) (internal quotations omitted); *see also In re Baby Boy H.*, 585 A.2d 1054, 1056 (Pa. Super. Ct. 1991) (holding same).

Plaintiff submits three pieces of evidence to support its claim that the 1967-72 policies exist, and that they do not exclude coverage of the underlying lawsuit.  First, in a document filed with the district court, Defendant states that "Halstead was the named insured under a number of comprehensive general liability insurance policies for the period of 3-31-67 through 3-31-77," (J.A. 366.), although the attorney who signed this document claims the date "3-31-67" was a typo, and an amended document was later submitted.  Second, Plaintiff highlights Defendant's computer records

6

which state that Plaintiff's 1972 policy was a "RENEWAL." (J.A. 554.) Finally, Plaintiff relies on the testimony of a PMA employee who stated that the specific language contained in the pollution exclusion was not approved by the Pennsylvania Commissioner of Insurance until 1970, and thus this exclusion could not have existed in policies prior to that date. Based only on this evidence, Plaintiff asks this Court to infer that the pre-1972 policies were substantially similar to the post-1972 policies, except that they did not contain the pollution exclusion or any similar provision.

Such an inference cannot be made under the clear and convincing evidence standard. Even assuming that the Defendant's admission and its computer records could lead a reasonable jury to conclude that the pre-1972 policies actually exist, that same jury must also be convinced that the contents of these policies encompass the underlying lawsuit in this case. Furthermore, a reasonable jury could only reach this conclusion if it believed the conclusion to be supported by evidence that is "clear, direct, weighty, and convincing as to lead to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Foley* 179 A. at 597.

Plaintiff's only evidence regarding the contents of the pre-1972 policies is a statement by Defendant's employee that the precise language used in the post-1972 policies' pollution exception could not have been contained in policies existing before 1970. Even if this statement is taken to be true, it is not sufficiently "clear, direct, weighty and convincing" to allow a reasonable jury "without hesitancy" to conclude that the underlying lawsuit falls within the terms of the policy. As the district court stated, "Mueller does not present any evidence of other terms of the policies that might provide or preclude coverage." (J.A. 177.) Absent such evidence, we hold that the district

court correctly granted summary judgment on Plaintiff's claims brought under the alleged pre-1972 policies.

**B.      The March 31, 1972-1978 Policies**

   **1.      The burden of proof**

Although the March 31, 1972-1978 polices contain an exclusion for damages caused by the release or escape of toxic chemicals, Plaintiff argues that the underlying lawsuit falls within the exemption to this exclusion, which states that "this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." (J.A. 378.) When a pollution exclusion contains a "sudden and accidental" exemption, lower Pennsylvania courts have held that the policyholder bears the burden of demonstrating that the exemption should apply, *see, e.g.*, *Lower Paxton Township. v. U.S. Fidelity and Guar. Co.*, 557 A.2d 393, 399 (Pa. Super. Ct. 1989) (holding that a Supreme Court of Pennsylvania decision "strongly suggests" that the burden of proving a sudden and accidental exemption should apply rests with the policyholder). Furthermore, the Third Circuit—the circuit most experienced in Pennsylvania law—agrees that this burden rests with the policyholder. *See Northern Ins. Co. of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 195 (3d Cir. 1991) (Alito, J.) (predicting that the Supreme Court of Pennsylvania would follow the lower court's decision in *Lower Paxton*). As these courts possess far greater experience in interpreting Pennsylvania law than the Sixth Circuit, we follow their guidance here, and place the burden of demonstrating that the sudden and accidental exemption applies with Plaintiff.

   **2.      The meaning of "sudden and accidental"**

8

The insurance policies provide no definition of the words "sudden and accidental," and the parties disagree as to their meaning. While Plaintiff asserts that these words apply to any toxic discharge which is "unexpected and unintended," (Plaintiff's Br. 22,) Defendant argues that they only encompass discharges which are both unexpected and "abrupt in time." (Defendant's Br. at 21.) We find Defendant's arguments more convincing.

In *Sunbeam Corp v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001), the Supreme Court of Pennsylvania noted a consensus among Pennsylvania courts that "sudden and accidental" means "simply that damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, *meaning abrupt and lasting only a short time*, and accidental, meaning unexpected." *Id.* at 1194 (quoting *Lower Paxton,* 557 A.2d at 399) (emphasis added). Nevertheless, the court in *Sunbeam* added that this facially "unambiguous" meaning of "sudden and accidental" may not apply in the context of the insurance industry if that industry has adopted a different, customary meaning for that term. *Id.* at 503-04. Accordingly, the court remanded *Sunbeam* to allow fact finding on whether industry custom trumps the otherwise unambiguous meaning of "sudden and accidental." *Id.* at 505.

In the instant case, the district court conducted exactly the same inquiry into the customary meaning of "sudden and accidental" which the Supreme Court of Pennsylvania required in *Sunbeam*. Defendant presented several experts who suggest that, if "sudden and accidental" does have a meaning within the insurance industry, that meaning matches the lower Pennsylvania courts' definition encompassing both abruptness and unexpectedness. Defendant's expert Jerome McAvoy, a twenty-seven year veteran of the insurance industry with twelve years of experience in insurance

regulation, testified in a deposition that "'Sudden' meant quick or abrupt," and that the "sudden and accidental" exemption was not meant to allow claims for "damage caused by gradual pollution discharges." (J.A. 260.) Similarly, James Kilgore, who worked as an examiner in the Pennsylvania Insurance Department from 1965 until 1978, testified that

> I would have understood ["sudden and accidental"] to restrict pollution coverage to a pollution "accident." That is precisely what the explanation says. Obviously, damage caused by gradual pollution discharges would be excluded.

(J.A. 263-64.)

Admittedly, Defendant's expert Robert Lazarus reached a somewhat different conclusion than McAvoy and Kilgore. According to Lazarus, an insurance consultant, "the interpretation of the word 'sudden' is not universal" throughout the insurance industry. Instead, Lazarus maintains, "[i]t is individually interpreted by each company that writes the coverage . . . ." (J.A. 773.) While Lazarus' testimony differs from that of Defendant's other experts, however, his testimony does not lead to a different conclusion regarding the *legal* meaning of "sudden and accidental."

Applying the facts of the instant case to the legal framework created by *Sunbeam*, either McAvoy and Kilgore are correct that "sudden and accidental" has a customary meaning, in which case that meaning encompasses abruptness, or Lazarus is correct that "sudden and accidental" has no such customary meaning. If no customary meaning exists, however, then *Sunbeam* requires this Court to apply the facially unambiguous meaning of the term, and hold that "damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." 781 A.2d at 1194. In either event

the result is the same: the "sudden and accidental" exemption applies only to toxic discharges which are *both* abrupt and unexpected.

On appeal, Plaintiff cites no evidence in the record to rebut this conclusion, instead stating simply that "[a]lthough Mueller disagrees with the District Court's determination of the meaning of 'sudden and accidental' for the purposes of this appeal, such issue is ultimately not relevant." (Plaintiff's Br. 22.) Presented with no arguments contradicting Defendant's proposed meaning of "sudden and accidental," we hold that these words mean both abrupt and unexpected under Pennsylvania law.

### 3. Defendant's obligation to Plaintiff

Thus far, we have reached two conclusions: 1) the burden of proving that the "sudden and accidental" exemption applies in this case rests with Plaintiff; and 2) the words "sudden and accidental" encompass both abruptness and unexpectedness. Given these two conclusions, we believe that the district court correctly determined that the March 31, 1972-78 insurance policies do not require Defendant to reimburse Plaintiff's legal fees in the underlying lawsuit.

The pollution exclusion provides that "this exclusion does not apply if such discharge . . . is sudden and accidental." As a threshold matter, the parties disagree as to the meaning of the word "discharge." Defendant argues that the "discharge" in this case occurred at the moment "the pollutants were placed into the waste pits," (Defendant's Br. 26.), while Plaintiff asserts that a "discharge" occurred only when the pollutants began to seep out of the waste pits. (Reply Br. 9.) As the district court correctly noted, however, this disagreement does not need to be resolved. Plaintiff does not assert, and the record does not support, a claim that the pollutants were suddenly

and accidentally placed in the waste pits. Indeed, it would be quite remarkable for Plaintiff to claim that the repeated dumping of waste oil in two clay-lined waste pits over the course of many years, was anything other than intentional.

Similarly, if a "discharge" occurred only when the pollutants escaped from the waste pits, then the discharges which occurred in this case do not fall within the "sudden and accidental" exemption. As the policyholder carries the burden of proving that the escape of pollutants from the waste pits was sudden and accidental, *Lower Paxton*, 557 A.2d at 399, Plaintiff introduced significant amounts of extrinsic evidence regarding the circumstances of the toxic discharges from the two Superfund sites. While Plaintiff contends that this extrinsic evidence demonstrates that the discharges were abrupt and unexpected, we view Plaintiff's evidence differently. Even viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could only interpret it as proving that discharges from the two sites were frequent, continuous and highly predictable.

According to a November 15, 1969 newspaper article introduced into evidence by Plaintiff, the U.S. Corps of Engineers determined that the South 8th Street site was flooded an average of over 62 days a year, causing the waste oil stored at that site to escape into the Mississippi River and the surrounding soil for over one-sixth of any given year. Similarly, a May 11, 1975 report introduced by Plaintiff shows that flooding during March of that year caused waste oil from the South 8th Street site to escape for four consecutive days, eventually finding its way into a nearby bayou. These news reports are corroborated by the deposition testimony of Larry Gurley, the operator of the South 8th Street site, who testified that the area was "constantly being flooded, and each time it rained, the flooding situation got worse." (J.A. 636.) As the district court correctly determined, no reasonable

12

jury faced with this evidence—evidence which was introduced by Plaintiff—could conclude that the flooding of the South 8th Street site was either abrupt or unexpected. Quite to the contrary, a reasonable jury could only conclude that the flooding of this site occurred often, was sufficiently well-known to be reported by local media, and could last for days at a time.

Plaintiff's evidence regarding the Gurley Pit site leads to a similar conclusion. In deposition testimony, William Gurley, one of the operators of the site, testified that the Gurley Pit site filled up with water during 1974, prompting Larry Gurley to write the West Memphis City Attorney on September 27, 1974 requesting that the city provide additional drainage. In his September 1974 letter, Larry admitted "that on several occasions this year, we have had a flooding situation here in our plant . . . ." (J.A. 639.) In 1977, the Environmental Protection Agency wrote the Gurleys informing them that there "may be a discharge from your facility . . . ." at the Gurley Pit site. (J.A. 638.) Similarly, the EPA's "Superfund Site Close Out Report" on the Gurley Pit site found that releases occurred from this site in 1978 and 1979, the later causing as much as 500,000 gallons of oil to escape into the surrounding environment. (J.A. 642.) Again, a reasonable jury could only find that the discharges from the Gurley Pit site were frequent and well-known, not abrupt and unexpected.

Despite the overwhelming evidence suggesting that the toxic discharges from both sites were frequent, well-known and often long lasting, and despite the fact that Plaintiff introduced this very same evidence into the record, Plaintiff maintains that the district court's grant of summary judgment was inappropriate. To support this claim, Plaintiff relies on *Grant-Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954 (6th Cir. 1990) and *Employers Ins. of Wausau v. Petroleum Specialties,*

*Inc.*, 69 F.3d 98 (6th Cir. 1995), two cases which, applying Michigan law, reversed a grant of summary judgment to allow additional fact-finding on whether pollutive discharges were sudden and accidental. 905 F.2d at 958; 69 F.3d at 107. Both of these cases, however, undermine Plaintiff's case.

*Grant-Southern* stands for the proposition that, under Michigan law, when pollution damages "may have been the result of a few discrete polluting events, each of which was short in duration and accidental in nature," then those discharges fall within a sudden and accidental clause. 905 F.2d at 957. *Employers Insurance* added further to this analysis, holding that "[w]hen a pollution discharge occurs on a regular ongoing basis over a [lengthy] period as a normal part of the [industrial] operation . . . it is impossible to characterize those discharges . . . as sudden within the plain and obvious meaning of that term." 69 F.3d at 106 (internal quotations omitted). Assuming these Michigan law cases may be applied to the instant Pennsylvania law case, both cases suggest that the discharges in the instant case were not sudden and accidental. The instant case's discharges were frequent, well-known and long lasting. In other words, they "occur[ed] 'on a regular ongoing basis over a [lengthy] period as a normal part of the [industrial] operation'". *Id.* Faced with Plaintiff's own evidence in this case, no reasonable jury could have found that the instant discharges were "short in duration." Accordingly, neither *Grant-Southern* nor *Employers Insurance* saves Plaintiff's case, and the district court correctly held that the post-1972 insurance plans did not require Defendant to cover Plaintiff's legal costs in the underlying lawsuit.

## II. PMA'S OBLIGATION TO REIMBURSE MUELLER FOR THE REASONABLE COST OF SETTLING THE UNDERLYING LAWSUIT

14

In addition to its claim that Defendant was obligated to provide it with legal defense in the underlying lawsuit, Plaintiff also claims that Defendant must indemnify it for the costs of settling that suit. As discussed above, however, the policies at issue in this case do not cover the underlying lawsuit. Furthermore, Plaintiff bears a more difficult burden to demonstrate that it has a right to indemnification under these policies than it bore with respect to its claim seeking defense. *See Gedeon*, 188 A.2d at 322 (holding that "there may be an obligation to defend" under an insurance policy, even though there is "no obligation to indemnify"). Accordingly, the district court correctly rejected Plaintiff's claim seeking reimbursement for the cost of settling the underlying lawsuit.

## III.   APPLICABILITY OF PENNSYLVANIA'S BAD FAITH INSURANCE STATUTE

Finally, Plaintiff alleges that Defendant violated Pennsylvania's bad faith insurer statute. Under Pennsylvania law, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured," the court may award interest on the claim, award punitive damages against the insurer, or assess court costs and attorney fees against the insurer. 42 Pa.C.S.A. § 8371. Plaintiff alleges that Defendant violated this bad faith insurer statute by "fail[ing] to analyze Mueller's claim" regarding the underlying lawsuit, failing to communicate with Plaintiff regarding the claim, and delaying a coverage decision until after the instant lawsuit was filed. (Plaintiff's Br. 38.) We disagree.

Pennsylvania's bad faith insurance statute does not provide a definition of "bad faith," and the Supreme Court of Pennsylvania has not explained what a plaintiff must prove to establish a violation of this statute. Nevertheless, both the Third Circuit and Pennsylvania's intermediate

appellate court agree that a bad faith insurance claim may not be stated unless "the insurer lacked a reasonable basis for denying benefits. . . ." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997); *see Terletsky v. Prudential Property and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994). Furthermore, this lack of a reasonable basis for denying benefits must be proven by clear and convincing evidence. *Klinger*, 115 F.3d at 233.

Given this requirement, Plaintiff's bad faith insurer claim must fail. As discussed above, the underlying lawsuit does not fall within the scope of the insurance policies. Therefore, Defendant had more than just a "reasonable basis for denying benefits," *Id.,* it had a legally sound reason for doing so,[3] and the decision of the district court rejecting Plaintiff's bad faith insurer claim must be affirmed.

### CONCLUSION

Because the insurance policies at issue in this case did not cover the underlying lawsuit, the district court correctly granted summary judgment in favor of Defendant. The decision of the district court is **AFFIRMED**.

---

[3]Defendant also argues that the Pennsylvania bad faith insurer statute may not be applied here because "Tennessee will not apply a foreign law that is contrary to the legislation or public policy of Tennessee, or is penal in nature." *Paper Products Co. v. Doggrell*, 261 S.W.2d 127, 129 (Tenn. 1953). As the Supreme Court of Pennsylvania has held that punitive damages are "purely penal in nature," *Hoy v. Angelone*, 720 A.2d 745, 749 (Pa. 1998), we agree that Tennessee law prevents the application of the punitive damages provisions of the bad faith insurer statute.